The **NORTHWESTERN MUTUAL LIFE INSURANCE CO., Plaintiff,**

v.

**Harry Oliver LINARD, an Underwriter at Lloyd's, et al., Defendants-Appellees,**

and

**Vainqueur Corporation, Defendant-Appellant and Cross-Claimant.**

**No. 614, Docket 73–2085.**

United States Court of Appeals, Second Circuit.

Argued March 6, 1974.

Decided June 6, 1974.

Richard Gyory, New York City (Robert R. Kreis, Levin, Kreis, Ruskin & Gyory, New York City, of counsel), for defendant-appellant and cross claimant.

William G. Symmers, New York City (Symmers, Fish & Warner, New York City, of counsel), for defendants-appellees.

Before MOORE, MANSFIELD and OAKES, Circuit Judges.

OAKES, Circuit Judge:

Vainqueur Corporation, the shipowner, appeals from the dismissal of its cause of action on three Time Hull policies of marine insurance, against the underwriters. The suit was commenced by a mortgagee, Northwestern Mutual Life Insurance Co. ("Northwestern"), and the shipowner cross-claimed against the underwriters; before the case was tried a settlement was agreed upon between Northwestern and the underwriters so that the trial related only to the shipowner's cross claim.

The insurance was on the vessel "Vainqueur," which sank following an explosion on March 14-15, 1969. The underwriters, appellees here, claimed that the sinking was due to sabotage and that the ship was scuttled. The district court heard all the evidence and concluded that the "circumstantial evidence of deliberate scuttling is insufficient to establish by a preponderance of the evidence that the Vainqueur was

scuttled." The court held, however, that there was sufficient evidence of scuttling to satisfy what it called the underwriters' burden of producing evidence, so that in effect "the evidence of scuttling is in balance or equipoise." It then went on to hold, purporting to follow English scuttling cases dealing with burden of proof, that the basic burden of persuasion in an action on marine insurance to show that a loss arose from a covered peril is on the plaintiff; while Vainqueur Corporation made out a prima facie case, the underwriters then met their burden of going forward with evidence of scuttling. Since, the trial court held, the burden of persuasion remained on Vainqueur Corporation and the evidence was in equipoise, judgment was against the shipowner. Scuttling was thus not an exception under an exclusionary clause, as to which the underwriters would have had the burden of proof. *See* Prashker v. United States Guarantee Co., 1 N.Y.2d 584, 592, 154 N.Y.S.2d 910, 916, 136 N.E.2d 871, 875 (1956). Rather, the court held, the insured had not persuaded the trier that the event came within the insurance policy in the first instance.

The Vainqueur flew the Liberian flag and was owned by appellant Vainqueur Corporation, a Liberian company. The stock of this company was owned by the mother of Raoul Slavin, who held a power of attorney for her in respect to it. Slavin was the principal also of Auxiliary Power Corporation, which was the managing agent for the Vainqueur, with offices in New York. The vessel, displacing about 22,500 tons, was built in 1957 and 1958 in Montreal, Canada. It was powered by an 8-cylinder, 2-cycle main propulsion diesel engine, with additional power provided by two generators each driven by a diesel. The ship had been purchased in 1967 by Vainqueur Corporation from a subsidiary of Northwestern for $412,500 in cash and a seven per cent promissory note in the amount of $1,287,500, secured by a Liberian ship mortgage. Vainqueur Corporation continued previously carried machine and hull insurance in the amount of $3,750,000. During the Vainqueur Corporation's ownership the vessel had a number of problems including a main engine breakdown in 1968, a port generator breakdown in December of 1968, and an anchor chain break with a consequent minor collision with three other vessels after arrival at New Orleans in early 1969. At the time of the sinking, the vessel was operating under a bulk sugar charter providing for two voyages from Vera Cruz to New Orleans and was carrying 20,000 long tons of sugar on the second voyage.

With respect to the cause of the sinking, the evidence below showed that an explosion was heard throughout the ship at about 11:40 p. m. on the night of March 14, 1969, in the vicinity of the engine room, causing extensive flooding and causing the ship to sink within an hour. The underwriters' expert evidence indicated that the detonation of an explosive device in the No. 6 starboard wing tank sank the vessel. The underwriters' expert also contradicted the Vainqueur Corporation's expert that a starboard generator engine crank case explosion or a main engine crank case explosion combined with structural failure could have sunk the ship. The court noted, but did not give great probative weight to, the uncontradicted testimony of the underwriters' expert that there were no known instances of the loss of a merchant vessel as a result of a diesel engine crank case explosion.

There was further circumstantial evidence adduced by the underwriters from which scuttling could have been inferred. One Marius Pieterse was employed by Vainqueur Corporation as a Port Captain, having lost his previous job for self-dealing; he was sufficiently close to Slavin that the telephone in Slavin's New York apartment was listed in Pieterse's name and he worked quite closely with various Slavin corporations. He joined the vessel in New Orleans after the anchor chain break and did engage during the voyage in question in an inspection of certain of the vessel's

wing tanks. The evidence below indicated that on March 13 and 14, he entered the No. 6 starboard wing tank of the vessel, where the explosion apparently subsequently may have occurred, upon more than one occasion. There was some evidence from which it could have been found that Pieterse was then interested in the precise location of the Vainqueur and the depth of the water. While the court noted that there was no credible evidence that Pieterse purchased explosives or had possession of them at any time during the final voyage, there was evidence from Gail D. Monroe, a friend of Pieterse's wife-to-be, that during the course of a telephone call from New Orleans to Houston Pieterse told her "they are making me blow up the Vainqueur," and that he planned to do this and that it would be done between New Orleans and Vera Cruz, together with a subsequent call from Vera Cruz in which he told her, she said,

> that he had to set a device whereby the ship would blow up and blow up in such a way as to penetrate the especially heavy iron plates, double iron plates that are used in the Vainqueur, and do this so that he could get the crew where they wouldn't be hurt, send a radio message, and then try to get the whole crew off the ship.

> And he mentioned that this had to be done in the deepest water.

Finally, he allegedly told Mrs. Monroe that after the sinking he had $75,000 to $85,000 coming to him as "his portion of the Vainqueur." Pieterse denied the incriminating statements and explained that he had said "what do you want me to do, you want me to blow up the goddamned ships?" because he "couldn't get it through . . . their heads

[those of Mrs. Monroe and her close friend, Pieterse's fiancee] that [he] had to do a job, that [he] had many responsibilities . . . ." The court said that it could not find "on the basis of the testimony of Mrs. Monroe that the Vainqueur was purposefully scuttled."

■ Appellees adduced considerable evidence of Slavin's motive [1] to sink the Vainqueur to collect the insurance proceeds. Slavin was in financial difficulty; he was experiencing trouble in meeting the mortgage payments and had requested in writing several extensions from Northwestern. The Vainqueur was having trouble obtaining freight charters, although it may have had two lined up, and the owner had little cash available for payment of the insurance premiums and had taken out bank loans. There was a history of major insurance losses occurring to Slavin-connected vessels. In early March of 1969 the value of the Vainqueur was less than had been paid for it, *i.e.*, the value was $1,535,000, while the insurance remained in the total sum of $3,750,000.[2]

■■ Much of the argumentation in the briefs relates to the facts and whether or not scuttling was proven. We take it for purposes of this appeal that the findings made by the district court were supported by the evidence and in no instance have they been shown to be clearly erroneous. Compania Martiartu v. Royal Exchange Assurance Corp., [1924] A.C. 850 (H.L.). The shipowner argues that the testimony of Mrs. Monroe should not have been received since it included hearsay of Pieterse and that there was no evidence that Pieterse was speaking as the shipowner's agent within the scope of his authority, either actual, apparent or im-

1. MacKinnon, J., in Lemos v. British & Foreign Marine Ins. Co., 39 Lloyd's List.L.Rep. 275, 283 (K.B.D.1931), set forth three "types of facts" to be taken into account in a scuttling or "cast away" case: (1) the circumstances of the sinking; (2) the communications among the owner, master and crew; (3) the motives of owner and master.

2. A vessel's being "overinsured" is a factor properly taken into consideration by a court on the question of motive. *Id.* at 288. *See also* Compania Martiartu v. Royal Exchange Assurance Corp., [1924] A.C. 850, 852 (H. L.) (Lord Birkenhead) ("The loss of the vessel at that particular moment meant indeed the difference to the company between solvency and insolvency").

plied. *Cf.* Northern Oil Co. v. Socony Mobil Oil Co., 347 F.2d 81, 84–86 (2d Cir. 1965). Whatever the validity of that evidentiary rule—which plainly does not apply to statements of a coconspirator made in the furtherance of a conspiracy, United States v. Anunziato, 293 F.2d 373, 378 (2d Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961), and may be thought not to apply to a "Port Captain" supposedly a trouble-shooter, in close relationship to the principal—the fact is that Pieterse himself here testified as a witness and was subject to cross-examination as to his declarations inconsistent with his testimony. In such a case his declarations cannot be considered hearsay. 3A Wigmore, Evidence § 1018, at 996 (Chadbourn rev. 1970); Model Code of Evidence Rule 503(b); Uniform Rule 63(1); Letendre v. Hartford Accident & Indemnity Co., 21 N.Y.2d 518, 289 N.Y. S.2d 183, 236 N.E.2d 467 (1968). *See also* United States v. De Sisto, 329 F.2d 929 (2d Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964).

We come then to the principal question on this appeal—does the underwriter have the burden of proving that there was a scuttling by the preponderance of the evidence, or does the shipowner have the burden of persuading the trier by a preponderance of the evidence that the loss was within the policy, which burden is not met when the underwriter adduces evidence, which is "in equipoise" with the shipowner's evidence, that there was a scuttling by explosion?

■ The marine policy provides coverage as set forth in the note.[3] The principal coverage or "perils" clause is that of the standard British hull policy. G. Gilmore & C. Black, The Law of Admiralty 64 (1957).[4] The "specially to cover" clause is also the standard clause relative to machinery breakdown, as amended to broaden coverage further; this is, of course, the well-known "Inchmaree" clause, which takes its name from the vessel in Thames & Mersey Marine Insurance Co. v. Hamilton, Fraser & Co., 12 App.Cas. 484 (1887), where the House of Lords restrictively read "perils of the sea" in the then new age of steam vessels not to include damage from a pump clogged through valve failure. *See* Saskatchewan Government In-

---

3. Touching the Adventures and Perils . . . of the Seas, Men-of-War, Fire, Lightning, Earthquake, Enemies, Pirates, Rovers, Assailing Thieves, Jettisons, Letters of Mart and Counter-Mart, Surprisals, Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners and of all other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the said Vessel, &c., or any part thereof; excepting, however, such of the foregoing Perils as may be excluded by provisions elsewhere in the Policy or by endorsement. . . .

This insurance also specially to cover (subject to the Average Warranty) loss of or damage to the subject matter insured directly caused by the following :—

Accidents in loading, discharging or handling cargo, or in bunkering;

Accidents in going on or off, or while on drydocks, graving docks, ways, gridirons or pontoons;

*Explosions on shipboard or elsewhere;*

Breakdown of motor generators or other electrical machinery and electrical connections thereto, bursting of boilers, breakage of shafts, or any latent defect in the machinery or hull, (excluding the cost and expense of replacing or repairing the defective part) ;

Breakdown of or accidents to nuclear installations or reactors not on board the insured Vessel;

Contact with aircraft, rockets or similar missiles, or with any land conveyance;

Negligence of Charterers and/or Repairers, provided such Charterers and/or Repairers are not Assured(s) hereunder;

Negligence of Master, Mariners, Engineers or Pilots;

*provided such loss has not resulted from want of due diligence by the Assured,* the Owners or Managers of the Vessel, or any of them. Masters, Mates, Engineers, Pilots or Crew not to be considered as part owners within the meaning of this clause should they hold shares in the Vessel.

(Emphasis added.)

4. This policy included the word "like" in the concluding clause covering "other . . . Perils, Losses and Misfortunes. . . ." *But see* Feinberg v. Ins. Co. of North America, 260 F.2d 523 (1st Cir. 1959).

surance Office v. Spot Pack, Inc., 242 F.2d 385, 391–392 (5th Cir. 1957). This was not a so-called "all risk" policy wherein all losses attributable to external causes are covered, absent specific exclusion thereof. *Cf.* Chase Rand Corp. v. Central Insurance Co., 152 F.2d 963, 964 (2d Cir. 1946). *See* II J. Arnould, Marine Insurance § 856 (Chorley & Bailhache, 15th ed. 1961) (hereinafter cited as Arnould); Winter, Marine Insurance 193 (3d ed. 1952).[5]

 The burden of proof generally is on the insured to show that a loss arose from a covered peril. S. Felicione & Sons Fish Co. v. Citizens Casualty Co., 430 F.2d 136, 138 (5th Cir. 1970), cert. denied, 401 U.S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219 (1971). It is, of course, prerequisite to the liability of the underwriter, under either the general perils clause or the special coverage clause, that the loss be "proximately caused" by the peril insured against and claimed under. Lanasa Fruit Steamship & Importing Co. v. Universal Insurance Co., 302 U.S. 556, 58 S.Ct. 371, 82 L.Ed. 422 (1938); Arnould § 766. The loss, moreover, must be fortuitous. New York, New Haven & Hartford Railroad Co. v. Gray, 240 F.2d 460 (2d Cir.), cert. denied, 353 U.S. 966, 77 S.Ct. 1050, 1 L. Ed.2d 915 (1957).[6] While negligence,

whether or not gross, is not a defense to a marine policy generally, *id.* at 464, "willful misconduct" measuring up to "knavery" or "design" is, as a matter of public policy. *See id.* at 464–65; P. Samuel & Co. v. Dumas [1924] A.C. 431, 446–48, 453 (scuttling not a loss by peril of the seas, per Viscount Cave). There is no doubt but that under the English cases—to which great weight must be given in the field of marine insurance, Queen Insurance Co. v. Globe & Rutgers Fire Insurance Co., 263 U.S. 487, 492, 44 S.Ct. 175, 68 L.Ed. 402 (1924)—the defense of willful misconduct by way of scuttling or "casting away" is treated in a particular way. Because scuttling is a crime, an English court will not find that it has been committed "unless it is proved with the same degree of certainty as is required for the proof of a crime." Compania Naviera Vascongada v. British & Foreign Marine Insurance Co. (The "Gloria"), 54 Lloyd's List L. Rep. 35, 50 (K.B.D.1935) (Brandon, J.). At the same time, even though "not satisfied that the ship was scuttled," *id.*, if the court finds "that the probability that she was is equal to the probability that her loss was fortuitous, the plaintiffs [assureds] will fail." *Id.* at 50–51, *quoted with approval in* Palamisto General Enterprises S. A. v. Ocean Marine

5. In an "all risks" policy the burden is plainly on the underwriter to show that an exception to coverage applies. Redna Marine Corp. v. Poland, 46 F.R.D. 81 (S.D.N.Y. 1969). But, as noted by Lord Birkenhead, even an "all risks" policy is subject to the proposition that the damage must have been due to some *fortuitous* circumstance or casualty. British & Foreign Marine Ins. Co. v. Gaunt, [1921] A.C. 41, 46–47. See also Arnould § 856 & n. 96. *See generally* note 6 *infra.*

6. It was the law of England from early times that in order for there to be a peril of the seas "[t]here must be some casualty, something which could not be foreseen as one of the necessary incidents of the adventure. The purpose of the policy is to secure an indemnity against accidents which may happen, not against events which must happen." Thomas Wilson, Sons & Co. v. Owners of the Cargo Per the "Xantho," 12 App.Cas. 503, 509 (1887). Or as said by Lord Bram-

well (quoting Lopes, L.J.) in Hamilton, Fraser & Co. v. Pandorf & Co., 12 App.Cas. 518, 526 (1887), "It is a sea damage, occurring at sea, and nobody's fault." See also Grant, Smith & Co. v. Seattle Construction and Dry Dock Co., [1920] A.C. 162; E.D. Sassoon & Co. v. Western Assurance Co., [1912] A.C. 561. *But see* Small v. United Kingdom Marine Mut. Ins. Ass'n, [1897] 2 Q.B. 42, appeal dismissed, [1897] 2 Q.B. 311 (C.A.). The seventh of the rules for construction of marine insurance policies in the First Schedule to the Marine Insurance Act, 1906, 6 Edw. VII, c. 41, defined "perils of the sea" as referring only to "fortuitous accidents or casualties of the seas." The Act itself also covered the point in § 55(2)(a): "The insurer is not liable for any loss attributable to the wilful misconduct of the assured. . . ." For the foregoing (and divergent views) *see* P. Samuel & Co. v. Dumas, *supra. See also* E. Ivamy, Marine Insurance 149, 247 et seq. (1969).

Insurance Co., [1972] 2 Q.B. 625, 636 (C.A.); Astrovlanis Compania Naviera, S. A. v. Linard (The "Gold Sky"), [1972] 2 Q.B. 611 (C.A.).[7] The burden of proof, or rather risk of non-persuasion, is cast on the shipowners basically because they have more information more readily available. Compania Naviera Santi S. A. v. Indemnity Marine Insurance Co. (The "Tropaioforos"), [1960] 2 Lloyd's List L.Rep. 469, 473 (Q.B.D.).[8] But see Slattery v. Mance [1962] 1 Q.B. 676, 677. This does not mean that the underwriter may rest without meeting the prima facie case of the assured; he must go forward with evidence sufficient to convince the trier that the probability of scuttling is as great as the probability that the loss was fortuitous, Compania Martiartu v. Royal Exchange Assurance Corp. [1923] 1 K.B. 650, 655, 657 (C.A.), aff'd,

[1924] A.C. 850, at which point the risk of non-persuasion rests as it always has upon the assured. It is on this basis that the court below found for the underwriters and with it we have no quarrel.[9]

█ What then of the "specially to cover" or "Inchmaree" clause which specifically covers "loss . . . by . . . Explosions on shipboard or elsewhere . . . provided such loss . . . has not resulted from want of due diligence by the Assured"? Does this change the general rule above enunciated or call into play different factors or considerations of material moment? This clause, as we have said, was added to the standard marine insurance policies, primarily, as Judge Brown put it, "as the underwriters' response to the practical business needs of the shipping

---

7. Both *Palamisto* and *Astrovlanis* were before the Court of Appeals before trial as to whether a bill of particulars in reference to the scuttling had to be furnished by the insurer. The *Palamisto* court stated unequivocally that the quoted language from Branson, J.'s opinion in The Gloria "is good law." [1972] 2 Q.B. at 636. The question of burden was alluded to, but left open in Anghelatos v. Northern Assurance Co., 19 Lloyd's List L.Rep. 255 (H.L.1924), where the Earl of Birkenhead said, at 256, that as to who has "the onus of showing that the stranding was not accidental. . . . [s]ome difference of judicial opinion has appeared in the Courts below." It was felt unnecessary to decision since evidence of scuttling was clear. While the comments of Warrington, L.J., and Atkins, L.J., in Issais v. Marine Ins. Co., 15 Lloyd's List L.Rep. 186, 189, 191 (C.A.1923), indicate that the burden is on the insurer since the commission of a crime is involved, Roche, J., in Pateras v. Royal Exchange Assurance (The "Sappho"), 49 Lloyd's List L.Rep. 400 (K.B.D.1934), took quite the opposite tack, relying on Lord Justice Bankes of the Court of Appeal in Compania Martiartu v. Royal Exchange Assurance Corp., [1923] 1 K.B. 650. Interestingly, Roche, J., noted that in his opinion the question of burden of proof was "seldom . . . of importance" and observed that "it takes a good deal to persuade me at any rate that there is a rival explanation of sufficient plausibility to displace the presumption that there was an accident." Id. at 407. The same might have

been said by Judge Ward, below. See generally Arnould §§ 1272–73.

8. The general rule in the United States casts the burden in respect to the defense of arson in a fire insurance case upon the insurer. Yates v. State Farm Fire & Cas. Co., 417 F.2d 766 (5th Cir. 1969); Aetna Ins. Co. v. Gethcell Steel Treating Co., 395 F.2d 12 (8th Cir. 1968); Jamaica Time Petroleum, Inc. v. Federal Ins. Co., 366 F.2d 156 (10th Cir. 1966), cert. denied, 385 U.S. 1024, 87 S.Ct. 753, 17 L.Ed.2d 674 (1967); Baltimore American Ins. Co. v. Pecos Mercantile Co., 122 F.2d 143 (9th Cir. 1941); Kimball Ice Co. v. Hartford Fire Ins. Co., 18 F.2d 563 (4th Cir. 1927).; Kisting v. Westchester Fire Ins. Co., 290 F.Supp. 141 (D.Wis. 1968), aff'd, 416 F.2d 967 (7th Cir. 1969) (proof must be by a "clear preponderance"). See also Annot., 124 A.L.R. 1378, 1380 (1940). The rule is the same in England. See E. Ivamy, General Principles of Insurance Law 228–29 (2d ed. 1970). See also Empire Steamship Co. v. Threadneedle Insurance Co., 22 Lloyd's List L.Rep. 437, 534 (K.B.D.1925) (Branson, J.).

9. Wenhold v. Royal Ins. Co., D.C.Mass., 197 F.Supp. 75, 80 (1961) is not basically to the contrary; there the court assumed that the burden of persuasion in respect to scuttling was on the underwriter and found that it was not met. The case could as well have gone on the basis that proof of scuttling was insufficient to make out a prima facie case, i. e., to go to the trier of fact.

world in the face of adverse court decisions." Saskatchewan Government Insurance Office v. Spot Pack, Inc., 242 F.2d at 391. *See also* Ferrante v. Detroit Fire & Marine Insurance Co., 125 F.Supp. 621 (S.D.Cal.1954). Its purpose is, it has been recognized, "to broaden, not restrict, to expand, not withdraw, coverage." Saskatchewan Government Insurance Office v. Spot Pack, Inc., 242 F.2d at 391. The appellant's most persuasive argument, as we fathom it, is that the English scuttling rule applies only when coverage is founded upon a loss from the general perils of the seas; when there is specific or special coverage (as under the "Inchmaree" clause in the case of an "explosion"), the burden is on the underwriter—with or without an express exclusion in the policy—to persuade the trier of his affirmative defense. Wagman v. American Fidelity & Casualty Co., 304 N.Y. 490, 109 N.E.2d 592 (1952) (no express exclusionary provision; burden on insurer to establish violation of regulations); Seufert v. Commercial Travelers Mutual Accident Insurance Association of America, 263 N.Y. 496, 189 N.E. 563 (1934) (defense of non-payment not based on express exclusion; burden of persuasion on insurer). This rule applies all the more, the argument runs, where the defense rests on a criminal act. See Slocovich v. Orient Mutual Insurance Co., 108 N.Y. 56, 66, 14 N.E. 802 (1888) (defense of arson by shipowner—burden on insurer). Cases such as Automobile Insurance Co.

v. Central National Bank, Savings & Trust Co., 20 F.2d 619 (6th Cir. 1927). relied on by appellee, are distinguished by appellants as not involving an affirmative defense, but rather a question of causation; here, it is said, there is no dispute but that the loss was caused by the specifically covered "explosion." [10]

The argument, however, fails to meet the teachings of the English scuttling cases. In the end, the question of coverage turns on whether the event itself is fortuitous;[11] just as a scuttling is not a peril of the sea, P. Samuel & Co. v. Dumas, *supra,* so too a set explosion is not a fortuitous one. *E. g.,* Grauds v. Dearsley, 51 Lloyd's List L.Rep. 203, 222, 237 (K.B.D.1935) (Talbot, J.) (explosion); Compania Naviera Vascongada v. British & Foreign Marine Insurance Co., 54 Lloyd's List L.Rep. at 50–57. The question in each case is whether a fortuitous event has occurred bringing about coverage or application of the policy. Note 7 *supra.* In the event that it has, all affirmative defenses (such as non-payment of the premium, Seufert v. Commercial Travelers Mutual Accident Insurance Association of America, *supra*) must be established by the insurer. But the initial burden of persuading the trier that the event is fortuitous remains on the assured, a burden not met here. That portion of the "Inchmaree" clause providing for specific coverages was not intended to shift burdens of persuasion; it was rather to add as cov-

---

10. Neither party makes anything out of the proviso in the "Inchmaree" clause—"Provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners or Managers of the Vessel, or any of them." *See generally* Annot., 98 A. L.R.2d 952 (1964). Both parties dismiss this clause as a clause of art, relating to the duty to make or keep the vessel seaworthy, a duty concededly not violated here. *See* Saskatchewan Government Ins. Office v. Spot Pack, Inc., *supra.* We will not attempt to read something into it that the parties do not themselves, although one may wonder, if the duty is a continuing one, as in America it may be, id., whether a vessel would become unseaworthy if a bomb were placed in its No. 6 starboard wing tank? *Cf.* Pacific

Queen Fisheries v. Symes, 307 F.2d 700 (9th Cir. 1962), cert. denied, 372 U.S. 907 (1963) (want of due diligence under "Inchmaree" clause in permitting gasoline explosion). Of course, in any event the proviso does not relate to perils not specially covered by the "Inchmaree" clause. Frederick Starr Contracting Co. v. Aetna Ins. Co., 285 F.2d 106 (2d Cir. 1960).

11. fortuitous . . . adj. Happening by accident or chance; unplanned. See synonyms at *accidental.* [Latin *fortuitus,* from *forte,* by chance, ablative of *fors,* chance. See *fortune. . . .*
The American Heritage Dictionary of the English Language 518 (1970).

ered perils particular events that had been construed (quite too narrowly perhaps) not to be "perils of the sea," such as the breaking of shafts. This is assumed in Astrovlanis Compania Naviera S. A. v. Linard, *supra,* where the statement of claim, it is to be noted, alleged sinking of the "Gold Sky" by perils of the sea or a latent defect in her hull [the latter covered under the Inchmaree clause]." [1972] 2 Q.B. at 614.

And what of the arson cases, note 8 *supra*? Why should they and the scuttling cases not be treated alike since each involves a willful act of the owner? The underlying rationale given by the courts in the arson cases (and some of the earlier English scuttling cases, note 7 *supra*) is that the defense is a criminal act and therefore the burden should be on the person asserting that act.[12] They are both really based on the premises perhaps best set forth by Mr. Justice Harlan in Ritter v. Mutual Life Insurance Co., 169 U.S. 139, 157–158, 18 S.Ct. 300, 42 L.Ed. 693 (1898), *quoting* Knights of Golden Rule, Supreme Commandery & Co. v. Ainsworth, 71 Ala. 436, 446:

> In all contracts of insurance, there is an implied understanding or agreement that the risks insured against are such as the thing insured, whether it is property, or health, or life, is usually subject to, and the assured cannot voluntarily and intentionally vary them. Upon principles of public

policy and morals, the fraud, or the criminal misconduct of the assured is, in contracts of marine or of fire insurance, an implied exception to the liability of the insurer.

While we have found no authorities discussing the differences between arson and scuttling cases, two such occur. A practical difference is that in the case of fire—at least fire on land—there is more likely to be some evidence available to prove arson than in the case of a ship scuttling where the vessel is presumably at the bottom of the sea, so that the means of proof are often more readily available to the insurer in the case of arson than in the case of scuttling. *Cf.* Wigmore, Evidence § 2486, at 275 (1940). This in turn may explain the second difference, the historical difference in treatment, concededly little founded on logic: historically in fire policies one starts with a proven event, *viz.,* fire; in the scuttling cases, whether the "event" leading to the sinking was a covered peril was historically in question and would still be in question[13] except in cases like the present one in which the event—an explosion—was specifically covered in the "Inchmaree" clause. While that historical distinction has no validity in the present case, it cannot be said that the "Inchmaree" clause in any way affects the burden of proof on whether the event was fortuitous.

Accordingly, we affirm the judgment.

---

12. This rationale per se had little justification if evidence of the finding of arson or scuttling in the civil case were inadmissible in the criminal case. While there are occasional comments or cases contrary, both in the United States and England, the measure of persuasion in reference to the criminal act has generally been by a preponderance. Annot., 124 A.L.R. 1380 (1940), note 8 *supra*. And no one has yet extended the doctrine of collateral estoppel so as to make civil judgments admissible in criminal cases.

13. *Compare* Story, J., in Waters v. Merchants' Louisville Ins. Co., 36 U.S. 213, 11 Pet. 213, 219, 9 L.Ed. 691 (1837), *with* Story, J., in Columbia Ins. Co. v. Lawrence, 35 U.S. 507, 10 Pet. 507, 517–518, 9 L.Ed. 512 (1836). *See also* the life insurance cases where the insured is murdered by the beneficiary. *E. g.,* New York Mut. Life Ins. Co. v. Armstrong, 117 U.S. 591, 600, 6 S.Ct. 877, 29 L.Ed. 997 (1886). *See* note 6, *supra.*