**COLLEGE POINT DRYDOCK & SUP-PLY CO., INC., et al., Plaintiffs,**

v.

**NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PENNSYL-VANIA, Defendant.**

**No. 71 Civ. 795.**

United States District Court, S. D. New York.

Oct. 22, 1974.

---

McHugh, Heckman, Smith & Leonard, New York City, for plaintiffs; by Martin J. McHugh, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for defendant; by Joseph J. Magrath, 3rd, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge.

This admiralty case involves the sinking of the plaintiff's barge "UBC No. 5" on January 23 or 24, 1970. The defendant had issued a marine policy of insurance covering the barge against a total loss or constructive total loss as well as "sue and labor" expenses resulting from certain enumerated perils set forth in the policy.

About two weeks prior to her sinking, the UBC No. 5 had been in drydock for repairs. These repairs consisted of welding certain holes in the hull apparently caused by towing her through ice in the severe winter of 1969–1970.

On January 21, 1970, the barge was loaded with about 2,100 tons of coal at a railroad pier in South Amboy, New Jersey. After the barge was loaded she was moved to a waiting berth until a tug could come to move her to her ultimate destination. Sitting at the waiting dock on January 22nd the barge was observed to have about 6 inches of free board and was in no apparent distress. However, on the morning of January 23, 1970, the barge was observed to have a starboard list, and a tug was called to move her to shallow water because salvage operations were contemplated. Extra lines were put out to prevent the barge from moving away from the dock but these lines parted and between midday on January 23rd and 8:00 a. m. on January 24th, the UBC No. 5 completely sank.

Salvage operations were interrupted by a labor strike which lasted until April 1970, and it was not until May 25, 1970 that the barge was raised and towed to the shipyard of Ira S. Bushey and Sons Inc. (hereinafter "Bushey"), the parent corporation of plaintiff-owner Red Star Barge Line, Inc., and placed in drydock. While the barge was being raised, photographs were taken by a surveyor of the United States Salvage Association. These were introduced at trial but they provided no enlightenment as to how the barge might have been sunk. Meanwhile the plaintiff had notified the defendant that the barge had sunk and was being raised.

On May 25, 1970, the defendant's surveyor, Captain William Kaminsky, visited the barge at the Bushey drydock and made what he described as a cursory examination of the UBC No. 5. He testified that there were a number of holes in the bottom of the barge and that there were at least 48 holes ranging in size from $\frac{1}{8}''$ to $1''$ in diameter. He described the holes as being caused by wastage or deterioration of the metal plates making up the bottom of the barge. The plaintiff claims that on May 25, 1970, Kaminsky was shown a crack in the side of the forepeak section of the barge about 12 to 18 inches long and about 6 inches wide at its widest point. Kaminsky dsiputes this and I believe him. The report which he drew up of this "cursory" examination, made at a time when litigation was certainly not contemplated, makes no mention of the supposed crack.

On the same day that Kaminsky performed a cursory examination of the UBC No. 5, May 25, 1970, he was told that the formal survey would be held the following day. Therefore on May

26, 1970, Kaminsky once again went to the Bushey shipyard, armed with a camera, prepared to do the formal survey. Mr. Bushey and Mr. Davella, an employee of Bushey, told Kaminsky that no formal survey would be necessary since there would be no damage claim. The Bushey people told Kaminsky that they would prefer that he not take any pictures, and in accordance with their wishes he did not do so.

This is borne out also by the testimony of Harry Chassen, an underwriter for the defendant who recounted that on May 25, 1970, in the afternoon, he had been contacted by a representative of the defendant and told that there would be no damage claim and no need for a survey.

Plaintiff seeks to support its claim by a survey dated May 26, 1970, signed by three representatives of the plaintiff. It is interesting to note that the survey has a line for Captain Kaminsky's signature but that line is blank. Kaminsky testified that the first time he saw this survey was in the office of plaintiff's attorney when his deposition was taken. It is also of note that no photographs taken in connection with this survey (if any were taken) were sought to be introduced at trial.

The Bushey people estimated the cost of repairing the UBC No. 5 to be in the amount of $73,835.00. The plaintiff had already incurred costs in the amount of $40,493.23 in raising the vessel. The UBC No. 5 had a value of $100,000 which was the amount of insurance which defendant underwrote on the vessel for complete loss. The plaintiff, upon ascertaining the cost of repair on the barge decided to sell her for scrap and did so for $4,000 on June 18, 1970.

No formal claim of any kind was made on the insurance policy until August 1970, and plaintiff did not file a claim for constructive total loss of the barge until January 1971.

The claims now before the Court are two in number: (1) $100,000 for the constructive total loss of the UBC No. 5; and (2) $40,493.23 (subject to a $5,-000 deductible) under the "sue and labor" clause of the policy, that amount being the actual cost of raising the vessel and bringing her to the Bushey repair yard.

The defendant disclaims any liability since there is no proof that the sinking of the UBC No. 5 at South Amboy was caused by any "perils of the sea" covered by the contract of insurance. The defendant also argues that plaintiff cannot recover for a constructive total loss since plaintiff did not "abandon" (i. e. tender) the hulk of the UBC No. 5 to the underwriters and further that such "abandonment" should have taken place while the vessel was in its sunken state at the bottom of the harbor at South Amboy. This last argument strains credulity in the situation presented but it is unnecessary to reach it since the case must be decided in the defendant's favor on the first two arguments advanced.

■ There is a total lack of credible evidence as to the cause of the sinking of the UBC No. 5. The plaintiff must bear the burden of proof that the cause of the sinking comes within the coverage of the insurance policy. Continental Ins. Co. v. Patton-Tully Transp. Co., 212 F.2d 543 (5th Cir. 1954). And plaintiff has totally failed to meet this burden. Northwestern Mutual Life Ins. Co. v. Linard, 498 F.2d 556 (2nd Cir., 1974).

In the *Northwestern Mutual* case the Court of Appeals for this Circuit, in construing a marine insurance policy in which the perils clause was identical to the one in this action, ruled:

> "This was not a so-called 'all risk' policy wherein all losses attributable to external causes are covered, absent specific exclusion thereof.

> "The burden of proof generally is on the insured to show that the loss arose from a covered peril. It is, of course, prerequisite to the liability of the underwriter, under either the general perils clause or the special coverage clause, that the loss be 'proximately caused' by the peril insured

against and claimed under." 498 F.2d 556, at 561 (citations omitted).

"Perils of the sea" have been variously described by the Court of Appeals for this Circuit but the most apt definition is that adopted in The Giulia, 218 F. 744 (2d Cir. 1914), and quoted with approval thereafter, as follows:

> "Perils of the sea are understood to mean those perils which are peculiar to the sea, and which are of extraordinary nature or arise from irresistible force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence."

Id. at 746. See also R. T. Jones Lumber Co. v. Roen Steamship Co., 270 F.2d 456, 458 (2d Cir. 1959).

■ The plaintiff here admits that it cannot point to the precise "proximate cause" of the sinking of the UBC No. 5. It claims, however, that such a showing is unnecessary in light of its interpretation of the law in this Circuit as enunciated in New York, New Haven & Hartford R. R. v. Gray, 240 F.2d 460 (2d Cir. 1957) and Allen N. Spooner & Son, Inc. v. Connecticut Fire Ins. Co., 314 F.2d 753 (2d Cir. 1963). It is plaintiff's contention that these cases mean that any "opening in a vessel's hull, not caused by the owner's design or neglect, which admits sea water is a marine peril within the meaning of the insurance policy" (Plaintiff's Post-Trial Brief p. 10). I do not read the cases to hold such a far-reaching and all encompassing rule of law. Cf. Sipowicz v. Wimble, 370 F. Supp. 442 (S.D.N.Y.1974). It is unnecessary, however, for me to reach that question. Plaintiff by its actions in refusing to let Captain Kaminsky or anyone else on behalf of defendant to survey the UBC No. 5 prior to its disposition as scrap has foreclosed any finding by me as to the proximate cause of the sinking. I cannot even find that the alleged "crack" in the forepeak did in fact exist and the plaintiff's actions effectively thwart me from making any finding as to what caused this alleged crack.

Had the plaintiff at the time of the sinking treated the loss as a constructive total loss and made the requisite tender of abandonment (see, e. g., G. Gilmore & C. Black, J., The Law of Admiralty, 77–79 (1957)), then a proper survey could have been made. But that was not done. Under the circumstances the plaintiff has totally failed to meet its burden of proof and the cause must be dismissed.

This opinion constitutes findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.

Settle judgment on notice.