85 F.3d 68
 1996 A.M.C. 2266, 44 Fed. R. Evid. Serv. 1088
 In re BALFOUR MacLAINE INTERNATIONAL LIMITED, Debtor.
ATLANTIC MUTUAL INSURANCE COMPANY, Plaintiff-Appellant,
v.
BALFOUR MacLAINE INTERNATIONAL LIMITED; Van Ekris & Stoett
Inc.; Amro Bank; Bank Brussels Lambert, S.A.;
Banque Indosuez; BSI-Banca Della
Svizzera Italiana,
Defendants-Appellees.
INSURANCE COMPANY OF NORTH AMERICA, Plaintiff-Appellant,
v.
ARMENIA COFFEE CORPORATION, Defendant-Appellee,
Rafael Espinosa & Hnos., Bankers Trust Company, National
Westminster Bank, American Express Bank Ltd., Chase
Manhattan Bank, N.A., French American Banking Corp.,
Chemical Bank, First Fidelity Bank, New Jersey, PBTC
International Bank, Credit Agricole CNCA, BAII Banking
Corporation, Defendants.
 Nos. 327, 536, Dockets 95-5015(L), 95-7287(CON).
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 30, 1995.
Decided May 30, 1996.
 
 John A.V. Nicoletti, Donovan Parry Walsh & Repetto, New York City (John K. McElligott, Nooshin Namazi, Donovan Parry Walsh & Repetto, on the brief), for plaintiff-appellant.
 Stanley McDermott III, Piper & Marbury, L.L.P., New York City (David P. Langlois, Piper & Marbury, L.L.P., on the brief), for defendant-appellee.
 John M. Woods, Thacher Proffitt & Wood, New York City (Marilyn L. Lytle, John J. Kim, Thacher Proffitt & Wood, on the brief), for Amicus Curiae, American Institute of Marine Underwriters.
 Before: NEWMAN, Chief Judge, and ALTIMARI, and McLAUGHLIN, Circuit Judges.
 ALTIMARI, Circuit Judge:
 
 
 1
 The plaintiff-appellant Insurance Company of North America ("INA") appeals from a judgment of the United States District Court for the Southern District of New York (Sand, J.) awarding the defendant-appellee Armenia Coffee Corporation ("Armenia"), following a bench trial, $1,640,382 on its claim against INA for insurance coverage of coffee that allegedly disappeared from two warehouses in Mexico. See Atlantic Mutual Ins. Co v. Balfour Maclaine Int'l Ltd. (In re Balfour Maclaine Int'l Ltd.), 873 F.Supp. 862 (S.D.N.Y.1995).[1] INA principally contends on appeal that the district court (1) imposed the wrong burden of proof on INA, (2) erred in concluding that the coffee physically existed at the warehouses during the period of coverage, (3) erred in ruling that the doctrine of uberrimae fidei (utmost good faith) did not apply, and (4) erred in ruling that Armenia's claim is otherwise covered by INA's policy because INA waived certain defenses of non-coverage. Because the district court's conclusions are fully supported by the record and are proper as a matter of law, we affirm the judgment of the district court.
 
 Background
 A. The Underlying Transactions
 
 2
 Armenia imports coffee to the United States from a variety of countries. At the time of the incidents underlying this case, its coffee supplier in Mexico was Cafetalera Zardain Hermanos, S.A. de C.V. ("Zardain"), one of Mexico's largest coffee exporters. Purchase of the coffee was accomplished pursuant to the terms of pre-export contracts between Armenia and Zardain. The process from initial purchase to final delivery essentially entailed Zardain first buying the unmilled, green coffee from growers, and storing it in 69-pound bags in warehouses that it owned or leased throughout Mexico. Zardain used the services of Almacenadora Somex S.A. ("Somex"), a Mexican warehousing authority, to operate the two warehouses where the coffee at issue in this case allegedly was stored. Upon delivery of the coffee into the warehouses, Somex issued warehouse receipts or "certificates of deposit" ("Certificates") to Zardain, which allegedly evidenced the amount of coffee deposited for storage at the warehouse. Zardain, in turn, tendered the Certificates to Armenia, which made a partial payment of the coffee's purchase price to Zardain. When Armenia was ready to import the coffee, it returned the Certificates to Zardain. Zardain presented them to Somex, which in turn cancelled the Certificates by releasing the amount of coffee they represented. Zardain then milled the coffee, and trucked it overland to Laredo, Texas. Armenia paid the remainder of the purchase price upon delivery of the coffee in Laredo.
 
 
 3
 The Certificates issued by Somex were not the only documents allegedly recording the coffee stored at the warehouses. Zardain also prepared a "receiving report" each time it purchased coffee from a grower (the "receiving reports"). Zardain's receiving reports allegedly contained, among other things, the actual amount of coffee purchased from the grower and deposited into a specific warehouse, and the quality of the coffee. In addition to Zardain's receiving reports, Somex kept reports of monthly inventory inspections it conducted of the coffee stored in the warehouses it operated. These inspections involved corroborating the amount of coffee listed on the outstanding Certificates through an actual physical count of the coffee on hand at the warehouses. During the summer of 1990, the frequency of Somex's inspections was increased to a weekly basis, due to an increase in coffee volume. Finally, until July 1989, the Instituto Mexicano del Cafe ("Inmecafe"), an agency of the Mexican government that regulated the coffee industry, conducted quarterly nationwide inventory counts of coffee in Mexican warehouses.
 
 
 4
 Effective September 6, 1989, Armenia became insured for physical loss or damage in the United States and in specified foreign locations of the coffee it purchased and shipped, under an "all risks" marine open cargo policy issued by INA (the "policy"). The policy contained a separate warehouse storage risk provision covering coffee stored at specified warehouses, including the two Mexican warehouses utilized by Zardain for Armenia's account. The relevant language in the warehouse storage provision, found at paragraph 55 of the policy, stated that the "[g]oods and/or merchandise covered hereunder are insured [against] all risks of physical loss or damage from any external cause, irrespective of percentage...." Other than the standard Free of Capture and Seizure ("FC & S") and Strikes Riots and Civil Commotions ("SR & CC") clauses, the warehouse storage provision did not include any other exclusions limiting the scope of the risk covered, and none of the other exclusions listed in the policy are relevant to this case. Significantly, neither the policy nor the warehouse storage provision contained exclusions for losses resulting from conversion, theft, or disappearance.
 
 
 5
 B. Armenia's Claim for Lost Coffee and the Instant Suit
 
 
 6
 On September 17, 1990, the principals of Zardain were jailed in Mexico for fraud in connection with obtaining financing from foreign exchange transactions. Two days later Zardain's warehouses were sealed. Shortly thereafter, Armenia discovered that there were 11,998 bags of coffee represented by outstanding Certificates that were unaccounted for at the two warehouses at issue in this case. The coffee had been purchased by Armenia prior to October 1, 1988. Of the total amount of allegedly missing coffee, 9500 bags were represented by Certificates still held by Armenia at the time the Zardain warehouses were sealed. The remaining 2498 bags were the undelivered portion of 14,000 bags of coffee represented by Certificates that previously had been returned to Zardain by Armenia in July, 1989.
 
 
 7
 Armenia submitted a claim to INA on October 23, 1990, stating that 11,998 bags of export quality coffee with a value of approximately $1.75 million had been lost from the warehouses in Mexico. INA denied the claim and on December 20, 1990, filed a declaratory judgment action under the district court's admiralty jurisdiction against Armenia and its lender banks, seeking non-coverage of Armenia's claim. INA asserted three grounds for denying the claim: (1) Armenia had failed to demonstrate or prove that the alleged missing coffee was ever physically deposited in the named warehouses covered by the policy; (2) Armenia's documents and records were insufficient to establish that a physical loss occurred at an insured warehouse; and (3) the policy was void ab initio, because by failing to disclose that it had suffered two previous substantial losses of coffee stored in Mexican warehouses, Armenia made a material misrepresentation to INA at the time it applied for the policy. INA's case was consolidated with Atlantic Mutual's, and tried before the district court from June 12, 1994 through June 30, 1994.
 
 
 8
 C. The District Court's Factual Findings and Legal Conclusions
 
 
 9
 At trial, INA principally contended that the coffee had not "disappeared" from the Mexican warehouses, because it was never physically present there. INA further contended that Zardain was corrupt, that the Certificates were fraudulent as to the amount of coffee available at the warehouses, and that the Somex inspectors had been bribed by Zardain to approve the false figures. The district court was not convinced by INA's case and found in favor of Armenia, ultimately awarding it $1,640,382.25, inclusive of interest.
 
 
 10
 Relying on this Court's earlier decision in Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196 (2d Cir.1992) ("Atlantic "), a predecessor to the case which ultimately became consolidated with the instant one, the district court first held that there was no admiralty and maritime jurisdiction over the claims in this case, and that New York law governed the rights of the parties. See Balfour, 873 F.Supp. at 866. In Atlantic we considered whether the district court lacked admiralty jurisdiction over the same coverage claim that is principally at issue in the instant case. We held that, because the coffee stored in the Mexican warehouses had never been in transit or otherwise entered the maritime stream of commerce, the coffee's connection to maritime commerce was "too speculative and attenuated to justify admiralty and maritime jurisdiction." Atlantic, 968 F.2d at 200.
 
 
 11
 Second, the district court determined that the burden of establishing a prima facie case that the 11,998 bags of coffee actually existed but, for whatever reason, were not available rested with the insured, Armenia. Once Armenia established its prima facie case, the district court held that the burden then shifted to INA to rebut Armenia's case by coming forward with evidence establishing that the coffee never existed and that the cause of the loss was due to spurious or fraudulent Certificates. See Balfour, 873 F.Supp. at 866.
 
 
 12
 The district court found, for reasons discussed more fully below, that (1) Armenia had established its prima facie case that the coffee was lost, and (2) INA had failed to come forward with evidence establishing that the coffee never existed and that the loss was the result of spurious Certificates.
 
 
 13
 Next, the district court determined that INA's policy was not void ab initio under the doctrine of utmost good faith on account of Armenia's alleged concealment of prior coffee losses at Mexican warehouses when it applied for the INA policy, because the warehouse storage risks at issue were not marine risks. Applying the "ordinary" New York rule regarding concealments by applicants for insurance, the district court found that INA had not presented any evidence of fraud or concealment that would void INA's policy under New York law. Id. at 870.
 
 
 14
 Finally the district court held that certain defenses of non-coverage were not meritorious or had been waived by INA because they had not been pleaded in its complaint. These defenses included, among others: (1) that Armenia failed to prove that the alleged disappearance of the coffee took place during the temporal period of policy coverage, and (2) that Armenia had no insurable interest in the coffee because of a novation agreement which predated the loss. Id. at 869 n. 9, 871 n. 13.
 
 
 15
 INA now appeals from the district court's decision.Discussion
 
 
 16
 On appeal, INA contends that: (1) the district court erred by applying Mexican law to conclude that the Certificates, without more, were presumptive evidence of the existence of actual coffee at the warehouses and constituted the insureds' prima facie case; (2) the district court erred in ruling that the policy covered the loss of coffee; (3) the district court erred by imposing an improper burden of proof on INA; (4) the district court erred in ruling that Armenia established its prima facie case, and that INA failed to rebut it; (5) the district court erred in relying on the contents of the Certificates for the truth of the matter asserted in them, when the Certificates were not admitted as business records under Fed.R.Evid. 803(6); (6) the district court erred in ruling that the doctrine of utmost good faith was inapplicable; and (7) the district court erred in ruling that INA had waived its defenses of non-coverage.
 
 
 17
 We review the district court's factual findings for clear error, see Banker v. Nighswander, Martin & Mitchell, 37 F.3d 866, 870 (2d Cir.1994), and its conclusions of law de novo. Before discussing each of the issues raised on appeal, we consider as a threshold matter an objection raised by INA concerning the district court's proper exercise of its subject matter jurisdiction. See Can v. United States, 14 F.3d 160, 162 n. 1 (2d Cir.1994) ("[I]n most instances the question whether a court has subject-matter jurisdiction is, conventionally and properly, the first question a court is called on to consider.").
 
 A. Subject Matter Jurisdiction
 
 18
 INA contends that the sole basis of jurisdiction is under the court's admiralty jurisdiction. It further contends that if we find there is no admiralty jurisdiction over the claims before us, then the district court lacked subject matter jurisdiction to rule on INA's claims and its decision should be vacated and the action dismissed. According to INA, there is no basis for the district court's assertion of diversity jurisdiction, because the pleadings do not contain any information concerning INA's principal place of business.
 
 
 19
 INA's open cargo marine policy, like many such policies today, contains maritime and non-maritime obligations. Summarizing the law pertaining to admiralty jurisdiction over contract claims, we stated in Atlantic the general rule that a marine insurance contract containing both maritime and non-maritime obligations will not sustain admiralty jurisdiction. See Atlantic, 968 F.2d at 199 (citations omitted); see also Sirius Ins. Co. (UK) Ltd. v. Collins, 16 F.3d 34, 36 (2d Cir.1994). We noted, however, two exceptions to this general rule. First, that in the case of such a mixed policy, a claim under a maritime portion of the contract "will sustain admiralty jurisdiction where the maritime obligations can be separately enforced without prejudice to the rest." Second, where the non-maritime elements of the policy "are merely 'incidental' in an otherwise maritime contract, admiralty jurisdiction will encompass the entire contract." Atlantic, 968 F.2d at 199 (citations and internal quotations omitted); see also Sirius, 16 F.3d at 36.
 
 
 20
 Before applying these principles to a particular case, we explained in Atlantic that, as a threshold matter, the district court "must first consider whether an issue related to maritime interests has been raised," because "the question of whether a dispute falls within admiralty jurisdiction cannot be divorced from the 'purposes for which admiralty and maritime jurisdiction was granted.' " Atlantic, 968 F.2d at 199 (quoting Insurance Co. v. Dunham, 78 U.S. (11 Wall) 1, 24, 20 L.Ed. 90 (1870)); see also Sirius, 16 F.3d at 36. Towards this end, we held that "in examining whether admiralty jurisdiction encompasses a claim, a federal court must initially determine whether the subject matter of the dispute is so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction." Atlantic, 968 F.2d at 200 (citing Exxon Corp. v. Central Gulf Lines, Inc., 500 U.S. 603, 611, 111 S.Ct. 2071, 2076, 114 L.Ed.2d 649 (1991)).
 
 
 21
 In Atlantic the insurer, Atlantic Mutual, principally raised the same issues of coverage that are raised in this case concerning coverage of missing coffee from Zardain's Mexican warehouses, and the claims in its complaint were virtually identical to the claims in INA's complaint. We held in Atlantic that the district court lacked admiralty jurisdiction over Atlantic Mutual's claims because "the goods' connection with maritime commerce was simply too speculative and attenuated to justify admiralty and maritime jurisdiction in this case." Id. For the same reason, we hold here that INA's causes of action disclaiming coverage of Armenia's allegedly missing coffee on the ground that there was no loss also do not sustain the district court's admiralty jurisdiction. The coffee's connection with maritime commerce is simply too speculative and attenuated to justify admiralty jurisdiction: (1) Armenia's Mexican coffee was designated for transport by truck or rail to Texas, and (2) Armenia's coffee "never became marine cargo and never entered the maritime stream of commerce." Atlantic, 968 F.2d at 200.
 
 
 22
 Unlike Atlantic Mutual's complaint, however, INA's complaint includes an additional cause of action requiring further inquiry into the issue of our admiralty jurisdiction. INA's complaint states a third cause of action seeking to void the entire marine policy as a result of alleged concealments by Armenia during the course of applying for the policy of prior losses of coffee at Mexican warehouses. Specifically, INA seeks a declaration of its rights as a result of alleged concealments related to a provision of the policy which concerns the storage of goods at named locations in Mexico, the Dominican Republic, and several United States port cities that are "pending shipment, transhipment or reshipment and including transit to and between locations at which goods ... are insured and until delivered to final destination." Arguably, such a cause of action implicates the concerns of maritime commerce, because it involves a declaration of rights under a marine policy, albeit one that includes maritime and non-maritime obligations, with respect to a clause which potentially encompasses the coverage of goods stored in warehouses during, among other things, transhipment or reshipment from overseas.
 
 
 23
 Notwithstanding that INA's third cause of action arguably implicates the concerns of maritime commerce in a way that the other claims in its complaint do not, that is just a threshold inquiry. We must then consider whether either of the two exceptions applies to the general rule that marine contracts containing maritime and non-maritime obligations do not sustain the court's admiralty jurisdiction. See Atlantic, 968 F.2d at 199 ("[W]e do not question the validity of the general principles [but] find that their application in this case was premature."); Sirius, 16 F.3d at 37.
 
 
 24
 Clearly, in this case the exceptions do not apply. In seeking to deny coverage for the allegedly missing coffee stored at the Mexican warehouses, INA is raising a non-maritime obligation under the policy. The obligation is non-maritime because the nature of the underlying transaction being insured--the Mexican coffee stored in Zardain's warehouses--has no connection to maritime commerce; the coffee was to be transported overland, and therefore, would never enter the maritime stream of commerce. Cf. Exxon, 500 U.S. at 611, 111 S.Ct. at 2076 ("[T]he trend in modern admiralty case law ... is to focus the jurisdictional inquiry upon whether the nature of the transaction was maritime."). Further, this non-maritime obligation is not "incidental" to the policy as a whole. It required a separate premium and separate declarations, and accounts for a considerable volume of coffee insured under the policy.
 
 
 25
 Although we have previously asserted admiralty jurisdiction where a complaint by an insurer of a marine policy seeks a declaration that the policy is void because of concealments made by the insured during the course of applying for the policy, see Puritan Ins. Co. v. Eagle S.S. Co. S.A., 779 F.2d 866 (2d Cir.1985); see also Newark Ins. Co. v. Fasolino Foods Co., Inc., 1988 A.M.C. 1005 (S.D.N.Y.1987), these cases are distinguishable, because the obligations and insured interests at issue were maritime in nature. See Puritan, 779 F.2d at 869 (vessel's owners concealed engine damage and other repairs to two of the four vessels they sought to insure under a Hull and Machine insurance policy); Fasolino, 1988 A.M.C. at 1007 & n. 1 (policy terms at issue not limited to the policy's warehouse extension coverage, but also included other disputed terms "concern[ing] Fasolino's general obligations as insured").
 
 
 26
 Having determined that INA's claims do not sustain the Court's admiralty jurisdiction, we next inquire whether there is subject matter jurisdiction based on diversity of citizenship between the parties.
 
 
 27
 A corporation has dual citizenship for purposes of a federal court's diversity jurisdiction under 28 U.S.C. § 1332; namely, it is a citizen of the state of its incorporation and of the state where it has its principal place of business. See 28 U.S.C. § 1332(c)(1); Airlines Reporting Corp. v. S and N Travel, Inc., 58 F.3d 857, 861 (2d Cir.1995). INA admits that its state of incorporation is Pennsylvania, but contends that there is no information in the pleadings regarding its principal place of business. As a result, it maintains that diversity of citizenship cannot be definitively established and its complaint must, therefore, be dismissed. We find INA's argument disingenuous.
 
 
 28
 When pressed at oral argument where its principal place of business is, INA stated that, depending on the test used, its main marine office is in New York, and its "main principal office of all lines of business" is in Philadelphia. The location of INA's main marine office clearly does not suffice for the purposes of establishing citizenship under section 1332(c), because the statute does not focus on the principal place where the business underlying the subject matter of the dispute is conducted. Rather, it focuses on a corporation's principal place of business. Given that INA admits that its "principal office of all lines of business" is in Philadelphia, we hold that INA's principal place of business under section 1332(c) is Philadelphia, Pennsylvania. Accordingly, there is diversity of citizenship between the parties, as Armenia and its lenders are all citizens of either New York or New Jersey.
 
 B. The Merits of INA's Appeal
 
 29
 1. The Evidentiary Weight Given to the Certificates Under Mexican Law
 
 
 30
 INA contends that the district court erred by accepting as a matter of Mexican law that the Certificates, without more, constituted a prima facie case that the coffee existed at the warehouses. According to INA, by following Mexican law the trial court erroneously "created a presumption in favor of the appellee regarding the substance of the claim merely from the existence of the documents." INA contends that New York law governs the weight and sufficiency of the Certificates, and that the district court should have considered the Certificates along with all of the other evidence.
 
 
 31
 INA misreads the district court's opinion. Although the district court considered the alternative argument asserted by Armenia that under Mexican law the Certificates constitute a prima facie case that the coffee exists, and even intimated that it thought that was the proper interpretation of Mexican law, see Balfour, 873 F.Supp. at 867, the district court emphasized that it was not relying on Mexican law to determine the weight to attach to the Certificates standing alone. Instead, the district court made very clear that its finding that Armenia established a prima facie case rested, as a matter of New York law, on all of the evidence before it. Among the evidence establishing the prima facie case were: (1) the testimony and deposition evidence that the coffee at issue was purchased in the ordinary course of business and pursuant to long established trade patterns; (2) the fact that the Certificates were valid on their face, duly authorized by the Mexican authorities, and the coffee represented on these Certificates was not available to Armenia; and (3) the fact that the warehouse inspections conducted by Somex confirmed the existence of the coffee represented on the Certificates. See id. at 866-867.
 
 
 32
 Accordingly, there is no merit to INA's claim that the district court accepted as a matter of Mexican law that the Certificates alone constituted a prima facie showing that the coffee existed.
 
 2. The Policy Covers the Loss of Coffee
 
 33
 INA contends that although its policy insures against "all risks" of physical loss or damage to the coffee, the policy insures neither the existence of the coffee nor the risk of loss in connection with the wrongful issuance of negotiable warehouse receipts. In support of this contention, INA relies on two cases, Curacao Trading Co. v. Federal Ins. Co., 137 F.2d 911 (2d Cir.1943), cert. denied, 321 U.S. 765, 64 S.Ct. 521, 88 L.Ed. 1061 (1944), and Nieschlag & Co. v. Atlantic Mutual Ins. Co., 43 F.Supp. 797 (S.D.N.Y.1941), aff'd, 126 F.2d 834 (2d Cir.), cert. denied, 317 U.S. 640, 63 S.Ct. 31, 87 L.Ed. 516 (1942), which held that the all risk policies at issue in these cases did not cover the loss of goods resulting from the issuance of fraudulent warehouse receipts.
 
 
 34
 The warehouse coverage provision of the policy at issue provides coverage for "all risks of physical loss or damage from any external cause[.]" Significantly, the provision does not contain exclusions for loss due to mysterious disappearance. Absent such an exclusion for mysterious disappearance, "all risk" policies cover the "mysterious disappearance" or "fortuitous loss" of the goods insured. See Vasile v. Hartford Accident & Indem. Co., 213 A.D.2d 541, 624 N.Y.S.2d 56, 56 (2d Dep't 1995); Tuchman v. Public Serv. Mut. Ins. Co., 88 Misc.2d 336, 387 N.Y.S.2d 803, 805 (N.Y.City Civ.Ct.1976). See also Atlantic Lines Ltd. v. American Motorists Ins. Co., 547 F.2d 11, 13 (2d Cir.1976); Ingersoll Milling Mach. Co. v. M/V Bodena, 829 F.2d 293, 307 (2d Cir.1987) ("All risk coverage covers all losses which are fortuitous no matter what caused the loss, including the insured's negligence, unless the insured expressly advises otherwise. A loss is fortuitous unless it results from ... intentional misconduct of the insured.") (citation omitted), cert. denied, 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988); Northwestern Mut. Life Ins. Co. v. Linard, 498 F.2d 556, 561 (2d Cir.1974) ("[A]ll losses attributable to external causes ... absent specific exclusion thereof," are covered by all risk policy.); Allied Van Lines Int'l Corp. v. Centennial Ins. Co., 685 F.Supp. 344, 346 (S.D.N.Y.1988) ("All-risk coverage protects unexplained losses...."). Accordingly, INA's policy covers the unexplained or mysterious loss of coffee.
 
 
 35
 The district court was also correct in ruling that Curacao and Nieschlag are inapposite. In these cases, both of which involved the activities of the same warehouse owner and operator, the fraud or spuriousness of the warehouse receipts was conceded. See Curacao, 137 F.2d at 913; Nieschlag, 43 F.Supp. at 799 (describing the issuance of the warehouse receipts as fraudulent). Here, the fraud or spurious nature of the Certificates is the very issue in dispute. INA puts the proverbial cart before the horse by relying on Curacao and Nieschlag to argue that there is no coverage of the loss at issue. As we explain immediately below, to avoid coverage INA must come forward and show that there was no loss because the Certificates were spurious or fraudulent.
 
 3. The Burden of Proof Imposed on INA
 
 36
 INA further contends that the district court did not apply the proper burden of proof. Specifically, it argues that the district court erred in ruling that, upon Armenia's establishing its prima facie case that the coffee existed and was not available, "the burden ... shift[ed] to the insurer to establish that the coffee never existed" and that the cause of the loss was due to the allegedly spurious Certificates. Balfour, 873 F.Supp. at 866. INA maintains that the district court improperly shifted the burden of persuasion, when the only burden INA had was to present evidence sufficient to rebut Armenia's prima facie case, which INA claims it did. We find INA's contentions unpersuasive.
 
 
 37
 In order to recover under an all risk policy, the burden of proof is on the insured to prove a fortuitous loss of the covered property. See Vasile, 624 N.Y.S.2d at 56; Ingersoll, 829 F.2d at 307; Atlantic Lines, 547 F.2d at 12, 13. The insured, however, need not prove the cause of the loss. See Tuchman, 387 N.Y.S.2d at 805; Atlantic Lines, 547 F.2d at 13; see also British and Foreign Marine Ins. Co. v. Gaunt, [1921] 2 App. Cas. 41, 47 (The insured "is not bound to go further and prove the exact nature of the accident or casualty which, in fact, occasioned his loss."). Once the insured's prima facie case is established by its showing that a fortuitous loss occurred, the insurer meets the prima facie case by putting forward evidence establishing "that an exception to coverage applies." Northwestern, 498 F.2d at 561 n. 5 & 563; accord Pan Am. World Airways, Inc. v. Aetna Casualty & Sur. Co., 505 F.2d 989, 999 (2d Cir.1974) (An all risk insurer must meet insured's prima facie case by "proving that the cause of the loss came under one of the terms of exclusion."); Allied Van Lines, 685 F.Supp. at 346 (same); Tuchman, 387 N.Y.S.2d at 805.
 
 
 38
 Contrary to INA's assertions, the district court applied the correct burden of proof and did not shift the burden of persuasion to INA. The district court ruled that INA, as the underwriter, had the burden of coming forward and showing that there was no coverage of the loss established by Armenia, which is tantamount to INA's establishing that there was no loss because the "loss" was a fabrication of false Certificates. The situation is symmetrical to one where the all risk insurer must prove there is no coverage of a loss because the cause of the loss falls under one of the policy's exclusions. In this regard we again echo the words of Justice Harlan, as we did in Northwestern, that "[u]pon principles of public policy and morals, the fraud, or the criminal misconduct of the assured is, in contracts of marine or of fire insurance, an implied exception to the liability of the insurer." Ritter v. Mut. Life Ins. Co., 169 U.S. 139, 157-58, 18 S.Ct. 300, 306, 42 L.Ed. 693 (1898) (emphasis added, internal quotation and citation omitted).
 
 
 39
 4. Armenia's Prima Facie Case and INA's Rebuttal
 
 
 40
 According to INA, the district erred in ruling that Armenia met its burden of establishing a prima facie case that the coffee existed in the warehouses, and that INA failed to rebut Armenia's case. INA also contends that the district court's rulings on these issues is subject to plenary review, because they involve an erroneous application of law to the facts.
 
 
 41
 INA is mistaken as to the scope of our review of the district court's ruling. The district court's finding that there was sufficient coffee in the warehouses to cover the Certificates is subject to review for clear error. The conclusion of law, however, that Armenia established its prima facie case and that INA did not rebut Armenia's case, is subject to de novo review. See Banker, 37 F.3d at 870; Lever Bros. Co. v. American Bakeries Co., 693 F.2d 251, 255 n. 4 (2d Cir.1982).
 
 
 42
 The district court concluded that Armenia had made its prima facie case based on the following facts: (1) the purchases of coffee were in the ordinary course of business and pursuant to long established trade patterns followed by coffee growers and importers, and the parties in this case had bought and received tens of thousands of bags of coffee covered by Certificates; (2) the Certificates were valid on their face as warehouse receipts, and were duly authorized by the Mexican government; and (3) the Somex inventory inspection reports confirmed that there was sufficient coffee in the warehouses to cover the amount of coffee represented in the Certificates.
 
 
 43
 INA contends that these findings are erroneous, and supports its contention by pointing to evidence in the record that purportedly contradicts each finding. For example, INA points to evidence showing that the course of dealing between the parties was not "long established." It also relies a great deal on a 96,541 bag discrepancy between the amount of coffee represented by the Certificates and the amount of coffee allegedly deposited in the warehouses as represented by the Zardain receiving reports, to show that the Certificates overstate the amount of coffee available at the warehouses and therefore, that the Somex inventory inspection reports cannot be credible. However, ambiguous evidence does not make the district court's findings clearly erroneous. " 'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous,' " Metzen v. United States, 19 F.3d 795, 798 (2d Cir.1994) (quoting Anderson v. City of Bessemer, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)), and the reviewing court cannot substitute its judgment for the trial court's choice of which view of the evidence to credit, even if the reviewing court would have chosen otherwise. Bessemer, 470 U.S. at 573-74, 105 S.Ct. at 1511-12. The district court selected among two permissible views of the evidence in finding that the coffee existed, and its choice does not leave this Court with the "definite and firm conviction that a mistake has been committed." Id. at 573, 105 S.Ct. at 1511 (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).
 
 
 44
 Moreover, the district court's conclusion that Armenia established its prima facie case is correct as a matter of law. Armenia did not have to establish the cause of the loss; only that a fortuitous loss occurred. In order to do this, it had to first establish that the coffee existed, and then establish that it was not available at the relevant time. Having met both of these elements, the district court correctly concluded that Armenia's prima facie case had been established.
 
 
 45
 To rebut Armenia's case, INA presented evidence which attempted to show that Zardain and/or Somex engaged in fraud, and that the coffee never existed because the Certificates overstated the amount of coffee at the warehouses.
 
 
 46
 The district court's conclusion that INA failed to show that wrongful conduct or fraud on the part of Zardain, Somex or anyone else with respect to the Certificates was the cause of the alleged loss is supported by the record, and is correct as a matter of law. Notwithstanding INA's conclusory allegations of fraud, there is no tangible evidence in the record of any such fraud existing or causing the loss. While INA points to the discrepancy between the Certificates and the Zardain receiving reports as evidence of fraud, other evidence in the record supports the conclusion that no fraud had been perpetrated. As the district court highlighted, despite receiving the cooperation of the Zardain warehouse managers who signed the inspection reports, these managers did not testify that Zardain or Somex had fraudulently represented the amount of coffee at the warehouses, nor did INA attempt to elicit any such testimony from them during the trial.
 
 
 47
 On appeal, INA continues to assert in a conclusory manner that the Certificates were fraudulent or "suspect," but, other than emphasizing the discrepancy between the Certificates and the receiving reports, INA offers no tangible evidence of the fraud. While INA suggests that some of the testimony of the insured's expert auditor from Ernst & Young, Ira Zecher ("Zecher"), demonstrates the suspect nature of the Certificates, none of this testimony establishes fraud. Rather, Zecher's testimony and the other evidence INA cites pertains to the discrepancy between the Certificates and the receiving reports, which, in itself, is inconclusive as to fraud.
 
 
 48
 The district court was equally unpersuaded by INA's argument that the discrepancy between the figures in the Certificates and the receiving reports proved the non-existence of the coffee. The district court found that INA's figures were based on, what it described as, a theoretical net book inventory auditing method that utilized the receiving reports as the basis for determining the amount of coffee at the warehouses, but which did not utilize the inspection reports. The district court, however, gave more credence to the first-hand Somex inventory inspection reports, and their corroboration of the amounts of coffee on the Certificates. In particular, the district court found credible the testimony of Zecher, who, on behalf of Armenia, traveled to Mexico and reviewed the Certificates, receiving reports, inventory inspection records, bank statements and other documents, and double-checked the Certificates against the inventory inspection records. In view of the totality of evidence, the district court concluded that the physical inventory records corroborated that sufficient coffee existed at the warehouses to cover the Certificates. See Balfour, 873 F.Supp. at 868-69. This finding is not clearly erroneous, as it was supported by Zecher's testimony and Armenia's evidence. Moreover, in light of this finding, the district court's conclusion that INA did not rebut Armenia's case is correct as a matter of law. INA's reliance on the discrepancy is clearly insufficient to establish that the coffee never existed.
 
 
 49
 Finally, INA contends that its rebuttal evidence should, at the very least, have been held in equipoise with Armenia's evidence, and that as such the district court should have found that INA's evidence effectively rebutted Armenia's. The district court, however, did not find that INA's evidence was in equipoise to Armenia's; namely, that the probability the coffee never existed was equal to the probability that the fortuitous loss occurred. See Northwestern, 498 F.2d at 561. Rather, the district court concluded that the preponderance of evidence was in favor of the insureds. The record quite clearly supports this factual conclusion.
 
 
 50
 5. The Certificates Were Admissible Under Fed.R.Evid. 803(6)
 
 
 51
 INA contends that it offered the Certificates for the limited purpose of showing inconsistencies between the amount of coffee recorded on them and the amount of coffee recorded on the receiving reports. According to INA, the Certificates are inadmissible as business records under Fed.R.Evid. 803(6), because (i) the foundational element requiring that the information contained in the document be prepared or transmitted by a person with knowledge was not met, and (ii) in light of the discrepancy between the Certificates and the receiving reports, the Certificates are untrustworthy. We disagree with these contentions.
 
 
 52
 First, if INA offered the Certificates for the limited purpose of showing inconsistencies between the amounts of coffee recorded on them and the amounts of coffee recorded on the Zardain receiving reports, then it was also appropriate for Armenia to dispute this by showing consistencies between the figures on the Certificates and the figures ascertained from the Somex inspection reports and other corroborative documents.
 
 
 53
 Second, the Certificates were admissible as business records under Fed.R.Evid. 803(6). In order for a Certificate to issue, a deposit receipt acknowledging the amount of coffee delivered to the warehouse had to be signed by Carlos Zardain. Carlos Zardain testified at his deposition that Somex forwarded to him the deposit receipts containing all of the delivery information, and that he only signed the deposit receipts and returned them to Somex so that a Certificate could be issued. According to Carlos Zardain, the information on the deposit receipts was based on inspections by Somex employees at the time of delivery. Although a Somex director testified that he did not know who filled out the deposit receipts, the district court, as the trier of fact, was free to accept the testimony of Carlos Zardain over the Somex officer. In that event, its crediting of Carlos Zardain's testimony that the Certificates were based upon the Somex employees' first-hand knowledge suffices to establish the foundation requirement of Rule 803(6).
 
 
 54
 Finally, there is no merit to INA's contention that the Certificates are untrustworthy because the amount of coffee represented on them is contradicted by the Zardain receiving reports. That is precisely the issue that is in dispute, and cannot be the basis for any challenge to evidence intended to resolve that dispute. Rather, the discrepancy in figures is an issue that concerns the weight to be given to the Certificates, in light of all the other evidence.
 
 6. The Doctrine of Uberrimae Fidei
 
 55
 INA contends that the district court erroneously held that the warehouse storage risks at issue are not marine risks, thereby precluding application of the doctrine of uberrimae fidei, or utmost good faith, under federal maritime law. It further contends that the doctrine is equally applicable under New York law. The American Institute of Marine Underwriters has filed an Amicus Curiae brief supporting INA's contention.
 
 
 56
 The doctrine of utmost good faith provides "that the parties to a marine insurance contract are held to the highest degree of good faith," whereby "the party seeking insurance is required to disclose all circumstances known to [it] which materially affect the risk." Puritan, 779 F.2d at 870 (citing Btesh v. Royal Ins. Co. Ltd., of Liverpool, 49 F.2d 720, 721 (2d Cir.1931)). See also Stecker v. American Home Fire Assur. Co., 299 N.Y. 1, 84 N.E.2d 797, 798-99 (1949) ("In marine insurance, the insured is bound, although no inquiry be made, to disclose every fact material to the risk, within his knowledge.") (internal quotation and citation omitted); Mur-Joe Distribs., Inc. v. Reliance Ins. Co. of New York, 1989 A.M.C.2015, 2018 (Sup.Ct. N.Y. County 1989). Were the doctrine to apply here under New York law as a result of the alleged concealment by Armenia, then the policy can be declared void. On the other hand, if the doctrine does not apply, than the "ordinary" insurance rule in New York applies, under which, absent fraud, the insured's failure to disclose a fact about which it was not asked is not grounds for avoiding the policy. See Sun Ins. Co. of New York v. Hercules Secs. Unlimited, Inc., 195 A.D.2d 24, 605 N.Y.S.2d 767, 770-71 (2d Dep't 1993).
 
 
 57
 Under New York law, the doctrine of utmost good faith applies to contracts and risks that are "marine" in nature, but not to such contracts or risks that involve "inland marine" matters, such as the inland transportation of goods. See Stecker, 84 N.E.2d at 798; Scarburgh Co. v. American Manuf. Mut. Ins. Co., 107 Misc.2d 772, 435 N.Y.S.2d 997, 1000-01 (Sup.Ct.1979), aff'd, 79 A.D.2d 942, 439 N.Y.S.2d 298 (1st Dep't 1981). New York courts that have considered application of the doctrine to the warehouse storage risk provision of a marine policy have held that the doctrine does not apply if the warehouse storage provision can be severed from the main marine policy, and viewed as a separate "inland" risk. See Mur-Joe, 1989 A.M.C. at 2020; Ebisons Harounian Imports, Inc. v. Travelers Indemnity Co., 1993 A.M.C. 1149, 1150-51 (Sup.Ct. N.Y. County 1992), rev'd on other grounds, 195 A.D.2d 371, 600 N.Y.S.2d 242 (1st Dep't 1993); accord Scarburgh, 435 N.Y.S.2d at 1001.
 
 
 58
 INA and the Amicus urge that the doctrine of utmost good faith applies here, because the INA policy is a marine cargo policy covering maritime risks, and the warehouse coverage of coffee in Mexico is not severable from the policy as a whole. Armenia argues that the doctrine does not apply because the policy is not a "pure marine" policy, since it includes coverage of warehouse storage risks that are outside the scope of traditional maritime risks, and such coverage is severable from the policy as a whole. We agree with Armenia and hold that the doctrine does not apply under New York law, because the warehouse storage provisions at issue are severable from the remainder of INA's policy.
 
 
 59
 According to New York law, the severability of a contract is a question of the parties' intent, "to be determined from the language employed by the parties, viewed in the light of the circumstances surrounding them at the time they contracted." Christian v. Christian, 42 N.Y.2d 63, 396 N.Y.S.2d 817, 824, 365 N.E.2d 849, 856 (1977). As a general rule, "the contract is considered severable and divisible when by its terms, nature, and purpose, it is susceptible of division and apportionment." See First Sav. & Loan Ass'n of Jersey City v. American Home Assur. Co., 29 N.Y.2d 297, 327 N.Y.S.2d 609, 610, 277 N.E.2d 638, 639 (1971). "Where, by the same policy, different classes of property, each separately valued, are insured for distinct amounts, even if the premium for the aggregate amount is paid in gross, the contract is severable." Mur-Joe, 1989 A.M.C. at 2020 (citing Donley v. Glens Falls Ins. Co., 184 N.Y. 107, 76 N.E. 914 (1906)).
 
 
 60
 State law cases that have considered the issue of the severability of warehouse coverage from the remainder of the marine policy have looked to such factors as (1) whether the class of property insured under both the main policy and the warehouse coverage is the same, and (2) whether the warehouse coverage is integrated with the remainder of the marine policy in terms of valuation, exclusions and termination. Mur-Joe, 1989 A.M.C. at 2020-21; Ebisons, 1993 A.M.C. at 1150-51. Here, the warehouse coverage of paragraph 55 of the INA policy attached to a class of property that was separate from the main marine policy in that it insured coffee stored in designated warehouses, while the remainder of the policy covered worldwide coffee and cocoa transhipments from "warehouse to warehouse," but does not include coverage of storage in the warehouse. The parties also intended that the warehouse coverage provision not be integrated with the remainder of the policy in terms of valuation and declaration, because a separate premium was paid and separate declarations were required under the language of the provision. Finally, as we held above, insuring the coffee stored in the Zardain warehouses was not a marine risk, as the coffee was intended for shipment overland, and did not enter the stream of maritime commerce.
 
 
 61
 Accordingly, under New York law the doctrine of utmost good faith does not apply. The district court was, therefore, correct to hold that the doctrine was inapplicable and that under the applicable "ordinary" New York rule of disclosure, INA's policy cannot be voided. The district court's findings that Armenia disclosed everything it was asked to by INA during its application process, and that there was no evidence of a willful intent on Armenia's part to defraud INA by its failure to reveal the previous coffee losses, is supported by the record.
 
 7. Waiver of defenses
 
 62
 Finally, INA maintains that the district court erred in ruling that: (1) INA failed to prove that the missing coffee was lost during the temporal period of policy coverage, and that, in any event, INA waived this defense by not pleading it in the complaint, and (2) INA also waived its defense that Armenia did not have an insurable interest in the Mexican coffee because of a novation agreement dated August 14, 1990, whereby it gave up its rights to the Mexican coffee.
 
 
 63
 INA contends that these two claims cannot be waived because they concern whether an insurable interest in the coffee exists, and, as such, are not defenses to coverage but, rather, are claims regarding whether there is coverage in the first place. Under New York law, the issue of the existence or non-existence of coverage cannot be waived. See Albert J. Schiff Assocs., Inc. v. Flack, 51 N.Y.2d 692, 435 N.Y.S.2d 972, 975, 417 N.E.2d 84, 87 (1980); Sears Oil Co., Inc. v. Merchants Ins. Group, 88 A.D.2d 753, 451 N.Y.S.2d 474, 476 (4th Dep't 1982). Only defenses to coverage can be waived. See New York v. AMRO Realty Corp., 936 F.2d 1420, 1431-33 (2d Cir.1991) (applying New York law). Because "an insurable interest establishes only the existence of a legally recognizable interest which may be protected by insurance coverage," Stainless, Inc. v. Employers' Fire Ins. Co., 69 A.D.2d 27, 418 N.Y.S.2d 76, 78 (1st Dep't 1979), aff'd, 49 N.Y.2d 924, 428 N.Y.S.2d 675, 406 N.E.2d 490 (1980), we hold that the claims raised by INA properly concern the existence or non-existence of coverage and are not waivable under New York law. As a result, the district court erred in ruling that INA waived these two claims by not pleading them in the complaint. Notwithstanding its error, we affirm the district court's ruling for the following reasons.
 
 
 64
 With regard to the first claim, we find no merit to INA's contention that the coffee was not lost during the temporal period of policy coverage, beginning on September 6, 1989. We have already concluded that the district court did not err in ruling that there was a sufficient amount of coffee available at the warehouses to cover the amount of coffee represented by the Certificates during the 1989 and 1990 seasons. Thus, as to the 9500 bags of coffee represented by Certificates that Armenia still held at the time the warehouses were sealed, the district court could properly infer that the coffee was lost during the temporal period of coverage. As to the 2498 bags of coffee comprising the remainder of Armenia's claim against INA, these bags were the undelivered portion of 14,000 bags of coffee represented by Certificates that Armenia had returned to Zardain in July 1989, before the policy commenced. The delivered portion of this coffee, however, (11,502 bags), was gradually delivered during the period of coverage under INA's policy. Consequently, it was permissible for the district court to infer that the 2498 bags were lost sometime after September 1989.
 
 
 65
 With regard to INA's second claim, the August 14, 1990 agreement between Armenia and Zardain is not a "novation" agreement whereby Armenia surrendered its rights to the Mexican coffee. Under New York law, in order to demonstrate a novation, four elements must be present: " '(1) a previously valid obligation; (2) agreement of all parties to a new contract; (3) extinguishment of the old contract; and (4) a valid new contract.' " Healey v. Healey, 190 A.D.2d 965, 594 N.Y.S.2d 90, 91 (3d Dep't 1993) (quoting Callanan Indus. v. Micheli Contr. Corp., 124 A.D.2d 960, 508 N.Y.S.2d 711, 712 (3d Dep't 1986)); see also May Dep't Stores Co. v. International Leasing Corp., 1 F.3d 138, 140 (2d Cir.1993) (defining novation under New York law as "an agreement for an existing obligation to be extinguished immediately by the acceptance of a new promise.").
 
 
 66
 By its terms the agreement rescheduled approximately $5 million in debt that Zardain owed to Armenia, and provided a structured schedule for shipping the remaining coffee to Armenia that was represented by Certificates held by Armenia or already returned to Zardain. Under the agreed upon shipping schedule, 1000 and 3000 bags of coffee, representing the balance of coffee due for the Certificates released to Zardain in July 1989, were to be respectively shipped to Armenia in August and September of 1990. In addition, 9500 bags of coffee were to be shipped in October and December of 1990. Significantly, however, the agreement did not extinguish Armenia's title and interest to the bags of coffee it was to receive under the Certificates it held or had returned to Zardain pursuant to the pre-export contracts it had entered into with Zardain. The agreement simply specified when those bags would be delivered. Accordingly, as a matter of law, the August 14, 1990 agreement did not act as a novation, and Armenia maintained its insurable interest in the coffee at issue.
 
 
 67
 We have considered the remaining issues raised by INA, and find them to be without merit.
 
 Conclusion
 
 68
 In sum, we hold that: (1) the district court did not err as a matter of law in holding (i) that INA's claims did not sustain the court's admiralty jurisdiction, and (ii) that, because the present action falls within the district court's diversity jurisdiction, New York substantive law governed INA's claims; (2) the district court did not err as a matter of law in ruling that the policy covered the loss of the coffee; (3) the district court did not err as a matter of law in imposing the burden on Armenia of proving that a fortuitous loss of the coffee had occurred, and in imposing the burden on INA of coming forward and proving that the coffee never existed at the warehouses because the warehouse Certificates were spurious; (4) the district court did not err as a matter of law in concluding that Armenia had met its burden and established its prima facie case, and in concluding that INA failed to rebut Armenia's case; (5) the Certificates were properly admissible under Fed.R.Evid. 803(6); (6) the district court did not err as a matter of law in holding that the doctrine of utmost good faith did not apply in this case; and (7) although the district court erred as a matter of law in holding that INA had waived its claims that Armenia did not have an insurable interest in the coffee, (i) the district court's finding that the coffee was lost during the temporal period of INA's coverage is not clearly erroneous, and (ii) the August 14, 1990 agreement between Armenia and Zardain did not act as a novation which extinguished Armenia's insurable interest in the coffee.
 
 
 69
 For the foregoing reasons, the judgment of the district court is hereby affirmed.
 
 
 
 [1]
 Before the district court, INA's action was consolidated with a similar action concerning coverage of allegedly missing Mexican coffee brought by Atlantic Mutual Insurance Company ("Atlantic Mutual") against Balfour MacLaine International Limited ("Balfour") and its banking syndicate. INA's and Atlantic Mutual's actions were tried together. The district court's judgment included an award of $28,921,827 against Atlantic Mutual on Balfour's claim. Atlantic Mutual appealed the judgment, and the instant appeal was consolidated with Atlantic Mutual's appeal. However, Atlantic Mutual and Balfour settled their case, and as a result Atlantic Mutual's appeal has been withdrawn