**NORTH AMERICAN FOREIGN TRADING CORP., Plaintiff,**

v.

**MITSUI SUMITOMO INSURANCE USA, INC., f/k/a Mitsui Marine and Fire Insurance Company of America and MSI Claims (USA), Inc., Defendants.**

No. 05 Civ. 4807(SAS),
05 Civ. 5827(SAS).

United States District Court,
S.D. New York.

April 24, 2007.

---

Joseph F. Donley, Rodney M. Zerbe, Daniel A. Lebersfeld, Dechert LLP, New York, New York, John F. Ryan, McDermott & Radzik LLP, New York, NY, for Plaintiff.

Francis A. Montbach, Jacqueline K. Seidel, Mound Cotton Wollan & Greengrass, New York, NY, for Defendants.

*OPINION & ORDER*

SCHEINDLIN, District Judge.

## I. BACKGROUND

North American Foreign Trading Corp. ("NAFT") brings these two con-

solidated actions against Mitsui Sumitomo Insurance USA, Inc., formerly known as Mitsui Marine and Fire Insurance Company of America, and MSI Claims (USA), Inc. (collectively, "Mitsui") for breach of a marine insurance policy issued by Mitsui to NAFT. The alleged breach arises out of Mitsui's declination of coverage for the loss of NAFT's goods sent to China for repair or refurbishment but never returned due to a mysterious disappearance. The earlier-filed case, 05 Civ. 4807, relates to losses from the Cidmate Warehouse, and the later-filed case, 05 Civ. 5827, relates to losses from the Lionda Warehouse. The Court has original subject matter jurisdiction over "any civil case of admiralty or maritime jurisdiction."[1] "Federal admiralty jurisdiction extends to cases involving marine insurance contracts."[2]

In late 2005, NAFT and Mitsui cross-moved for summary judgment in the Cidmate action. On January 30, 2006, the Court granted NAFT partial summary judgment, holding that Mitsui's policy covered the mysterious disappearance of NAFT's goods, and denied summary judgment for Mitsui on the ground that Mitsui failed to show NAFT's claim was time-barred as a matter of law under the policy's one-year limitations clause.[3]

On July 20, 2006, Mitsui moved for summary judgment on its limitations defense in the Lionda action. On November 7, 2006, the Court denied Mitsui's motion, holding that material issues of fact remained as to Mitsui's limitations defense.[4] The Court further held that "if the trier of fact determines that NAFT's loss occurred after May 25, 2004, Mitsui is estopped as a matter of law from asserting a limitations defense at trial" based on the Court's determination that Mitsui had lulled NAFT into delaying filing suit.[5]

The main issues remaining for trial were (1) whether NAFT could prove that the loss of NAFT's goods occurred while the goods were being held at a covered warehouse; and (2) whether the contractual limitations period in the Policy barred NAFT's recovery. A bench trial was held from February 20, 2007 through February 23, 2007. The following constitutes the Court's findings of fact and conclusions of law.

## II. FINDINGS OF FACT

### A. The Parties and the Policy

NAFT is a corporation organized under the laws of New York engaged in, among other things, the business of importing and selling consumer electronics, including cordless telephones.[6] NAFT often returns imported goods to a foreign manufacturer for repair, upgrade, replacement or repackaging, which are known as customer return units, or "CRUs."[7] Mitsui Sumitomo Insurance USA, Inc. issues and sells

---

1. 28 U.S.C. § 1333. *Accord New York Marine & Gen. Ins. Co. v. Tradeline (L.L.C.),* 266 F.3d 112, 121 (2d Cir.2001).

2. *New York Marine & Gen. Ins.,* 266 F.3d at 121 (citing *Advani Enters., Inc. v. Underwriters at Lloyds,* 140 F.3d 157, 161 (2d Cir.1998)).

3. *See North American Foreign Trading Corp. v. Mitsui Sumitomo Ins. USA, Inc. ("NAFT I"),* 413 F.Supp.2d 295, 302, 304 (S.D.N.Y.2006).

4. *See North American Foreign Trading Corp. v. Mitsui Sumitomo Ins. USA, Inc. ("NAFT II"),* 477 F.Supp.2d 576 (S.D.N.Y.2006).

5. *Id.* at 585–86.

6. *See* Joint Pretrial Order, Undisputed Facts ("UF") ¶ 1.

7. *See id.* ¶ 4. *See also* Trial Transcript ("Tr.") at 65:7–66:3 (Gjemajl (known as James) Zerka, NAFT's Chief Financial Officer).

marine insurance policies.[8]

Effective March 1, 2001, NAFT and several of its affiliates became insured under a marine insurance policy issued by Mitsui entitled "Open Cargo Policy No. OCMM 01000" (the "Policy").[9] Under Endorsement No. 2 to the Policy, effective as of May 1, 2001, the Special Warehouse Coverage Endorsement (the "Warehouse Endorsement") provided coverage for NAFT goods returned to and stored at various foreign warehouses, and listed specific warehouses in China.[10] Under Endorsement No. 19 to the Policy, effective as of January 1, 2004, the list of approved foreign warehouses covered by the Warehouse Endorsement was amended to provide coverage for NAFT goods returned to certain other warehouses in China.[11] The "Cidmate Warehouse" in Guangdong Province, China, was listed as a covered warehouse in both Endorsement No. 2 and Endorsement No. 19.[12] A Lionda warehouse in Xixiang, Baoan, Shenzhen, China (the "Old Lionda Facility"), was listed in Endorsement No. 2, but was replaced by the new "Lionda Warehouse" in Shiyan, Baoan, Shenzhen, China under Endorsement No. 19.[13]

## B. The Cidmate Claim

NAFT maintained a perpetual inventory report showing that between October 17, 2003 and March 1, 2004, NAFT returned to the Cidmate Warehouse in China, for repair, upgrade or replacement, at least $10 million of merchandise that was refurbished, and then re-shipped to the United States and received by NAFT.[14] As of March 2004, there was $1,267,078 of NAFT's merchandise at the Cidmate Warehouse that had been sent to China for refurbishment, but not yet returned to NAFT.[15] Given that there was only one Cidmate Warehouse used by NAFT and covered by the Policy, it is more likely than not that the goods arrived at the Cidmate Warehouse and were there at the time of the mysterious disappearance.[16]

### 1. The Mysterious Disappearance

On or about April 12, 2004, NAFT's inspection service in China, SGS, reported that it was unable to gain access to the Cidmate Warehouse.[17] On April 14, 2004, NAFT hired the Horizon Law Firm ("Horizon") to investigate the Cidmate Warehouse.[18] Testimony was offered to show

---

**8.** *See* UF ¶ 2. MSI Claims (USA), Inc. is affiliated with Mitsui Sumitomo Insurance USA Inc. *See id.* ¶ 3.

**9.** *See id.* ¶ 5. *See generally* Policy, Plaintiff's Trial Exhibit ("PX") 1. The Policy was cancelled effective September 13, 2004. *See* UF ¶ 6.

**10.** *See* UF ¶ 7. *See also* Policy at 22–28 (Warehouse Endorsement); *id.* at 38–39 (Endorsement No. 2).

**11.** *See* UF ¶ 8. *See also* Policy at 58–59 (Endorsement No. 19).

**12.** *See* UF ¶¶ 7–8.

**13.** *See id.*

**14.** *See id.* ¶ 9.

**15.** *See id.* ¶ 10.

**16.** Even if NAFT's goods did not reach the Cidmate Warehouse, the Policy provides all-risk coverage for goods lost in transit, so there would be coverage in either scenario. *See, e.g.,* Tr. at 159:23–160:3 (Marvin Margolies, former senior insurance adjuster for Mitsui) ("[T]heft along the way [i.e., during transit] ... would have been covered as part of the ocean marine warehouse-to-warehouse clause. Once it got into the warehouse, the all-risks coverage stopped and became [what Mitsui believed to be] special warehouse endorsement, limited perils.").

**17.** *See id.* at 206:4–13 (Robert Schweitzer, Vice President of NAFT).

**18.** *See id.* at 207:12–20 (Schweitzer).

that the People's Court of Dongguan City had issued an order sealing up some property maintained at Cidmate in order to preserve property for several Cidmate creditors, but no evidence was introduced that the Cidmate Warehouse itself was sealed, nor that NAFT's goods were part of the sealed property.[19] Thus, the evidence relating to the sealing of the Cidmate Warehouse is inconclusive as to when NAFT's goods disappeared from the Cidmate Warehouse.

On April 21, 2004, Robert Schweitzer, Vice President of NAFT, gained access to the Cidmate Warehouse.[20] During that visit, he discovered that NAFT's CRUs were missing.[21] I find that Schweitzer's visit, on April 21, 2004, marks the first time NAFT knew or should have known about the mysterious disappearance of its goods from the Cidmate Warehouse.

## 2. The Insurance Claim

On April 28, 2004, NAFT notified its insurance broker, Gregory Taylor of Roanoke Trade Services, Inc. ("Roanoke"), by fax, of missing merchandise at the Cidmate Warehouse, and forwarded to Taylor a letter dated April 22, 2004 from the Horizon Law Firm reporting to NAFT that its representatives had found the warehouse empty and abandoned.[22] On April 30, 2004, Roanoke notified Mitsui's insurance adjuster, Ken Bonamo of Mat-thews, Matson and Kelly, Inc. ("MMK") of the disappearance of the merchandise from the Cidmate Warehouse.[23] On May 3, 2004, Taylor, on behalf of NAFT, notified MMK that NAFT was submitting a claim under the Policy concerning the disappearance of the goods from the Cidmate Warehouse.[24]

In China, Mitsui appointed a "surveyor" known as Huatai Insurance Agency & Consultant ("Huatai"), to investigate the status of the Cidmate facility.[25] Mitsui also retained Meaden & Moore, LLP ("Meaden & Moore") to verify: (a) whether the Cidmate loss occurred; (b) the amount of the loss; and (c) where the claimed loss occurred.[26]

Meaden & Moore was in contact with NAFT regarding various document requests, between July 2004 and late-October 2004.[27] The records requested by Meaden & Moore, and made available by NAFT, included warehouse receipts, bills of lading, invoices, trust receipts, inventory reports, other accounting records, correspondence and narrative reports describing NAFT's business practices.[28] As part of its investigation, Meaden & Moore also visited NAFT's office on several occasions.[29]

On March 31, 2005, Meaden & Moore forwarded a final report concerning the Cidmate claim to Mitsui.[30] The report

---

19. *See id.* at 380:3–382:18 (Huang Hui, Chinese lawyer and investigator, witness for Mitsui).

20. *See id.* at 209:5–6 (Schweitzer).

21. *See id.* at 209:18–210:3 (Schweitzer).

22. *See* UF ¶ 12. *See also* 4/22/04 Letter from Li Jin, Horizon Law Firm, to NAFT ("Horizon Letter") at 1, Defendants' Trial Exhibit ("DX") F.

23. *See* UF ¶ 13.

24. *See id.* ¶ 14.

25. *See id.* ¶ 15.

26. *See id.* ¶ 16.

27. *See id.* ¶ 17.

28. *See id.* ¶ 18.

29. *See id.* ¶ 19.

30. *See id.* ¶ 21. *See also* 3/31/05 Letter from Meaden & Moore to Margolies ("Meaden & Moore Cidmate Report"), PX 69.

stated that Meaden & Moore "found no material difference between the $1,267,078 claimed as goods returned to Cidmate . . . and the documentation supporting the actual shipment of these goods to Cidmate."[31] NAFT was not given a copy of that report nor was NAFT told that the report had been completed and received by Mitsui.[32]

Under the Policy, Mitsui was required to make payment to NAFT "within thirty (30) days after proof of loss, proof of interest and adjustment."[33] On April 18, 2005, NAFT and Mitsui entered into a "Standstill Agreement," which provides that the parties "hereby agree that any and all rights of either party to file suit or proceed with litigation as respects the claim . . . regarding merchandise . . . at . . . Cidmate Technology Inc . . . . are by execution of this agreement to remain at status quo as of the date of this agreement up to and including May 5, 2005."[34] By letter dated May 4, 2005, the Standstill Agreement was extended to May 19, 2005.[35]

On May 2, 2005, Mitsui sent Roanoke a declination letter (the "Cidmate Declination Letter") setting forth Mitsui's analysis with respect to coverage, quoting Paragraphs 1, 13, 7(a) and (b) of the Warehouse Endorsement, and Paragraph 25 of the Policy.[36] Mitsui's sole stated ground for denying coverage on the Cidmate claim was the assertion that under the terms of the Warehouse Endorsement, "the involved loss was not due to any insured peril" under the Policy.[37] On May 10, 2005, Roanoke forwarded the Cidmate Declination Letter to NAFT.[38] On May 18, 2005, NAFT filed its complaint in the Cidmate action against Mitsui, seeking, *inter alia*, $1.25 million in alleged damages for 66,670 CRUs that were alleged to have mysteriously disappeared from the Cidmate Warehouse.[39]

## C. The Lionda Claim

From 2000 to 2004, Lionda manufactured new products for NAFT as well as repaired and refurbished NAFT CRUs at Lionda's facilities in China.[40] Once NAFT CRUs arrived in Hong Kong, Lionda would assume custody and control of the goods and would issue trust receipts to NAFT.[41] Lionda began using a new facility in or about January 2004, which is the Lionda Warehouse listed on Endorsement No. 19.[42] NAFT's inspection agent, SGS, inspected CRUs being refurbished in the new Lionda facility as late as April 2004.[43] Based on that fact, it is more likely than not that at least some of NAFT's CRUs

---

31. *Meaden & Moore Cidmate Report* at 4.

32. *See* Tr. at 90:22–91:1 (Zerka), 173:1–2 (Margolies). In fact, NAFT did not review the report until after commencing this action. *See id.* at 91:2–4 (Zerka).

33. Policy ¶ 46.

34. UF ¶ 22; Standstill Agreement, PX 73.

35. *See* UF ¶ 23.

36. *See id.* ¶ 24. *See also* 5/2/05 Letter from Margolies to Taylor (the "Cidmate Declination Letter"), PX 79.

37. Cidmate Declination Letter at 3.

38. *See* UF ¶ 25.

39. *See id.* ¶ 26. The parties do not dispute that claims pertaining to the Cidmate Warehouse are capped at $1.25 million and a deductible of ten percent applies. *See id.* ¶ 27.

40. *See* Tr. at 211:22–212:4 (Schweitzer).

41. *See id.* at 109:19–23 (Schweitzer).

42. *See* UF ¶ 8. *See also* Tr. at 212:12–19 (Schweitzer).

43. *See* Tr. at 220:22–221:2, 233:3–239:10 (Schweitzer). *See also* SGS Reports dated April 24, 2004 through April 30, 2004, PX 7.

had been sent to, arrived at and were being held in the new covered Lionda Warehouse and were never returned to NAFT due to the mysterious disappearance at issue.[44]

### 1. The Mysterious Disappearance

On March 8, 2004, NAFT wrote to Lionda claiming that Lionda was attempting to misappropriate NAFT's goods and that Lionda was violating its contractual obligations with NAFT by holding and not returning NAFT's CRUs.[45] On April 19, 2004, Schweitzer went to China to visit the new Lionda facility.[46] While he was there, he met with the new chairman of Lionda and toured the new facility.[47] During that visit, he was shown boxes that he believed contained NAFT's CRUs.[48] The following day, various correspondence was exchanged to confirm that NAFT's goods were at the new Lionda Warehouse: (1) NAFT sent a letter to Lionda asking for confirmation of the location of NAFT goods, which was returned with a handwritten response from Lionda listing the new facility's address (the same address listed in Endorsement No. 19);[49] (2) NAFT received a letter from Ge Wei Ming

of Lionda "assuring [NAFT] that all the rehaul units were moved here in our new factory and are all well secured";[50] and (3) NAFT received an email from Lionda attaching photographs that purported to show NAFT's merchandise inside Lionda's new facility.[51] Based on this evidence, I find that as of April 20, 2004, NAFT reasonably believed that its goods were at the Lionda Warehouse.

On April 30, 2004, due to a dispute between Lionda and certain creditors, the Shenzhen Intermediate People's Court, Guangdong Province, issued a notice sealing certain of Lionda's property at the Lionda Warehouse.[52] However, there was no evidence conclusively establishing whether NAFT's goods were sealed or not, nor whether the seal was airtight.

On May 10, 2004, NAFT filed a Demand for Arbitration against Shenzhen Lionda Group Corp., Lionda Technology Co., Ltd., Shenzen Lionda Materials Import & Export Co., Ltd., Shenzen Light Industry Import & Export Co., Ltd. (collectively, the "Lionda Companies") with the American Arbitration Association, seeking damages for NAFT's CRUs that the Lionda

---

**44.** Indeed, Mitsui admitted in its September 19, 2005 Amended Answer in the Lionda action (05 Civ. 5827) that "documents provided by Plaintiff suggest that the items at issue were converted or otherwise improperly removed from the [Lionda] warehouse." UF ¶ 33.

**45.** *See* 3/8/04 Letter from Robert Schweitzer of NAFT, to Mr. Chairman Lee of Lionda, DX MM.

**46.** *See* Tr. at 213:2–8 (Schweitzer).

**47.** *See id.* at 215:12–13, 217:6–11 (Schweitzer).

**48.** *See id.* at 215:24–216:17 (Schweitzer).

**49.** *See* 4/20/04 Letter from Schweitzer to Mr. Fang and Mr. Jun, of Lionda, PX 5. *See also* Policy Endorsement No. 19.

**50.** 4/20/04 Letter from Ge Wei Ming, the new Chairman of Lionda, to NAFT, PX 4. PX 4 was admitted for the limited purpose of showing that NAFT believed at that time that its goods were in the new Lionda Warehouse. *See* Tr. at 126:3–4.

**51.** *See* 4/20/04 E–Mail from Jun (Lionda) to Schweitzer, attaching photos of the Lionda Warehouse, PX 3. PX 3 was admitted for the limited purpose of showing that NAFT believed at that time that its goods were in the new Lionda Warehouse. *See* Tr. at 219:22–220:5.

**52.** *See* Seal-up Notice, DX PP; Tr. at 401:16–25 (admitting the seal-up notice).

Companies refused to repair and return (the "AAA Proceeding").[53] On May 13, 2004, NAFT sent a letter to Lionda accusing Lionda of "conspiring to and moving merchandise out of the factory."[54] On May 17, 2004, a letter written in Chinese and signed by Schweitzer addressed to the Chinese government stated, according to the English translation, that "before the warehouses were sealed, [Lionda] had already moved [NAFT's] merchandise . . . to another public warehouse and with the help of a Hong Kong Company . . . stole our merchandise."[55] Based on NAFT's words and conduct in May 2004, I find that NAFT either knew or should have known that its goods were missing from the Lionda Warehouse no later than May 17, 2004.

## 2. The Insurance Claim

On June 25, 2004, NAFT notified Taylor of a possible loss from the Lionda Warehouse and Taylor notified Mitsui on June 29, 2004.[56] Thereafter, Mitsui retained Meaden & Moore to verify: (a) whether the Lionda loss occurred; (b) the amount of the loss; and (c) where the claimed loss occurred.[57] Between June 2004 and May 2005, Meaden & Moore met with Zerka on several occasions, reviewed documentation regarding NAFT's shipments to Lionda and supporting letters of credit, and visited NAFT's office to discuss questions and concerns.[58]

On April 29, 2005, Michael Castillo of Meaden & Moore sent a "draft" of its findings regarding the investigation of the Lionda claim (the "Meaden & Moore Draft Lionda Report") to Margolies.[59] The Meaden & Moore Draft Lionda Report states that NAFT's claim "relates to an incident that took place at a Lionda manufacturing facility sometime in June 2004."[60] On May 24, 2005, Francis A. Montbach, one of Mitsui's attorneys, faxed a legal opinion to Mitsui, based on the draft report, which stated that the loss at the Lionda Warehouse was not covered under the Policy.[61] A draft declination letter accompanied that legal opinion.[62]

The following day, May 25, 2005, Meaden & Moore sent Mitsui its "final" report regarding NAFT's claim for the loss at the Lionda Warehouse.[63] This "final" report

---

53. *See* UF ¶ 29. *See also* NAFT's Demand for Arbitration, DX GGG. NAFT's November 15, 2004 Statement of Claim in connection with the AAA Proceeding asserted a cause of action for "Conversion" stemming from the fact that the Lionda Companies "have in their possession property belonging to NAFT," and that "[d]espite NAFT's repeated demands, they refuse to return this property to NAFT. Accordingly, [the Lionda Companies] have converted the property, and are jointly and severally liable in an amount to be determined at the hearing." UF ¶ 30. *See also* NAFT's Statement of Claim, DX HHH.

54. 5/13/04 Letter from Schweitzer to Lionda, DX QQ.

55. 5/17/04 Letter from Schweitzer to Public Security Bureau of Baoan District, Shenzen City, DX RR.

56. *See* 7/29/04 Fax from Taylor to Margolies (Mitsui), enclosing letter from Zerka to Taylor, PX 29.

57. *See* UF ¶ 34.

58. *See* 5/25/05 Letter from Meaden & Moore, LLP to Montbach regarding NAFT's stock loss at Lionda ("Meaden & Moore Lionda Report"), PX 85.

59. *See* UF ¶ 35. *See also* 4/29/04 Letter from Meaden & Moore to Margolies, PX 77.

60. PX 77.

61. *See* UF ¶ 36. *See also* 5/24/05 Letter from Montbach to Margolies ("5/24/05 Montbach Letter"), PX 82.

62. *See* UF ¶ 36. *See also* 5/24/05 Montbach Letter.

63. *See* UF ¶ 37. *See also* Meaden & Moore Lionda Report.

was identical in all respects to the draft Lionda report, with the exception that the "final" report was dated May 25, 2005, and was addressed to Montbach.[64] That same day, Taylor left a voicemail for Margolies inquiring into the status of NAFT's claim.[65] Margolies responded by email to Taylor, writing, "I have requested and am presently awaiting Meaden & Moore's report, and will update you hopefully next week."[66] NAFT was never informed of the existence of and never received a copy of either the draft or final Meaden & Moore report until litigation commenced.[67]

On June 16, 2005, Mitsui sent Roanoke a declination letter (the "Lionda Declination Letter") setting forth Mitsui's analysis with respect to coverage, quoting Paragraphs 1, 13, 7(a) and (b) of the Warehouse Endorsement, and Paragraph 25 of the Policy.[68] Mitsui's sole stated ground for denying coverage on the Lionda claim was the assertion that under the terms of the Warehouse Endorsement, "the involved loss was not due to any insured peril" under the Policy.[69]

NAFT filed its complaint with respect to the Lionda Warehouse on June 23, 2005.[70] In the complaint, NAFT sought, *inter alia*, $7,245,345 in alleged damages for 297,778 CRUs that allegedly had been "converted by Lionda or otherwise improperly removed from the warehouse."[71]

## III. LEGAL STANDARD

### A. Choice of Law

 The Policy is a maritime contract. Accordingly, "general federal maritime law, including federal choice-of-law rules apply."[72] "Federal maritime law requires us to determine 'the scope and validity of the [marine insurance] policy provisions [ ] involved and the consequences of breaching them' by using state law."[73] "Under federal choice-of-law rules, [the Court] determine[s] which state law to use by 'ascertaining and valuing points of contact between the transaction [giving rise to the cause of action] and the states or governments whose competing laws are involved.' '[74] The following factors are relevant to this analysis: "(1) any choice-of-law provision contained in the contract; (2) the place where the contract was negotiated, issued, and signed; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties."[75]

 Here, NAFT is a New York corporation and the Policy was executed in New

---

64. *See* UF ¶ 37. *See also* Meaden & Moore Lionda Report.

65. *See* UF ¶ 38.

66. *Id.*

67. *See* Tr. at 91:11–19 (Zerka).

68. *See* 6/15/05 Letter from Margolies to Taylor ("Lionda Declination Letter"), PX 90.

69. Lionda Declination Letter at 3.

70. *See* UF ¶ 39.

71. *Id.* The parties do not dispute that claims pertaining to the Lionda Warehouse are capped at seven million dollars and a deductible of ten percent applies. *See id.* ¶ 40.

72. *Advani Enters.*, 140 F.3d at 162 (citing *Sundance Cruises Corp. v. American Bureau of Shipping*, 7 F.3d 1077, 1080 (2d Cir.1993)).

73. *Id.* (alterations in original) (quoting *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 316, 75 S.Ct. 368, 99 L.Ed. 337 (1955)).

74. *Id.* (third alteration in original) (quoting *Lauritzen v. Larsen*, 345 U.S. 571, 582, 73 S.Ct. 921, 97 L.Ed. 1254 (1953)).

75. *Id.*

York. Given the absence of any factors pointing to any other state contacts, I conclude that New York State law applies, which, in any event, comports with the parties' assumption.[76]

## B. Interpretation of Admiralty Insurance Contracts

Under New York law, "[t]he starting point in interpreting an insurance policy is to determine whether the policy terms are ambiguous."[77] "Contractual language is unambiguous when it has a definite and precise meaning, unattended by any danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion."[78] "[A] provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading."[79] "An ambiguity exists where the terms of a contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."[80] "The determination of whether an insurance policy is ambiguous is a matter of law for the court to decide."[81]

"As a general rule, plain or unambiguous language will be given its ordinary meaning and effect, and the need to resort to rules of construction arises only when an ambiguity exists."[82] By contrast, "[i]f the court finds that the terms, or the inferences readily drawn from the terms, are ambiguous, then the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract."[83] All ambiguities in the contract are construed against the insurer and in favor of the insured.[84] The court must give effect to "the reasonable expectation and purpose of the ordinary business man when making an ordinary business contract."[85] The parties' intent must be "as-

---

**76.** *See, e.g.,* Plaintiff's Pretrial Memorandum at 5 ("The parties have previously acknowledged that the Policy should be construed in accordance with New York law."). The parties' assumption that New York law controls this dispute and their implied consent "is sufficient to establish choice of law." *Santalucia v. Sebright Transp., Inc.,* 232 F.3d 293, 296 (2d Cir.2000).

**77.** *Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.,* 190 F.3d 26, 32 (2d Cir.1999) (quotation omitted).

**78.** *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 461 (2d Cir. 1994) (quotation omitted); *G. Simons & Co. S.A. v. New Bar of N. Am.,* No. 98 Civ. 5162, 2005 WL 1137348, at *3 (S.D.N.Y. May 13, 2005).

**79.** *United Air Lines, Inc. v. Insurance Co. of State of Pa.,* 439 F.3d 128, 134 (2d Cir.2006) (quotation omitted).

**80.** *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's,* 136 F.3d 82, 86 (2d Cir.1998) (quotation omitted).

**81.** *Flagship Marine,* 190 F.3d at 33.

**82.** *Id.*

**83.** *Alexander & Alexander,* 136 F.3d at 86.

**84.** *See Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.,* 472 F.3d 33, 43 (2d Cir.2006) ("[W]here an insurer drafts a policy 'any ambiguity in [the] ... policy should be resolved in favor of the insured.'" (alteration in original) (quoting *Morgan Stanley Group Inc. v. New England Ins. Co.,* 225 F.3d 270, 276 (2d Cir.2000))). *See also Pepper v. Allstate Ins. Co.,* 20 A.D.3d 633, 799 N.Y.S.2d 292, 294 (3d Dep't 2005) ("[W]hen an insurance policy's meaning is not clear or is subject to different reasonable interpretations, ambiguities must be resolved in the insured's favor and against the insurer.").

**85.** *Kimmins Indus. Serv. Corp. v. Reliance Ins. Co.,* 19 F.3d 78, 81 (2d Cir.1994).

certained by examining the policy as a whole, and by giving effect and meaning to every term of the policy."[86] " 'Reasonable effort must be made to harmonize all of the terms of the contract.' "[87]

## C. Insurance Claims

### 1. Coverage

 A marine insurance policy typically provides coverage either for "all risks" or for only certain "named perils."[88] This Court has already ruled that the Warehouse Endorsement provides all-risk coverage to losses from covered warehouses, which includes the Cidmate and Lionda Warehouses.[89] To prove that an all-risk policy covers its claim, the insured has the burden of demonstrating "(1) the existence of an all-risk policy, (2) an insurable interest in the subject of the insurance contract, and (3) the fortuitous loss of the covered property."[90] "The insured, however, need not prove the cause of the loss."[91] Absent "an exclusion for mysterious disappearance, 'all risk' policies cover the 'mysterious disappearance' or 'fortuitous loss' of the goods insured."[92] Under

an all-risk policy, the insurer has the burden of "putting forward evidence establishing that an exception to coverage applies."[93]

### 2. Contractual Limitations Period Defense

 Under New York law, parties to a contract may designate a reasonable period of limitations within which a claim arising out of the contract is to be commenced, even if that period is shorter than the statutory period.[94] The insurer has the initial burden of establishing that the limitations period in the policy expired prior to the commencement of the action.[95] The contractual limitations provision here states, "No suit, action or proceeding against this Company for the recovery of any claim shall be sustainable unless commenced within one year from the date of the happening of the accident out of which the claim arises...."[96] Although New York courts have held that a one-year time limitation to bring suit for breach of an insurance contract is reasonable and en-

---

**86.** *Oot v. Home Ins. Co. of In.*, 244 A.D.2d 62, 676 N.Y.S.2d 715, 717 (4th Dep't 1998) (quotation omitted). *Accord New York Marine & Gen. Ins.*, 266 F.3d at 125; *Hartford Ins. Co. of the Midwest v. Halt*, 223 A.D.2d 204, 646 N.Y.S.2d 589, 594 (4th Dep't 1996) (citing *County of Columbia v. Continental Ins. Co.*, 83 N.Y.2d 618, 628, 612 N.Y.S.2d 345, 634 N.E.2d 946 (1994)).

**87.** *Oot*, 676 N.Y.S.2d at 717–18 (quoting *Hartford Ins.*, 646 N.Y.S.2d at 594).

**88.** *Miller Marine Servs., Inc. v. Travelers Prop. Cas. Ins. Co.*, No. 04 Civ. 5679, 2005 WL 2334385, at *4 (E.D.N.Y. Sept.23, 2005).

**89.** *See NAFT I*, 413 F.Supp.2d at 304.

**90.** *International Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (quotation omitted). These requirements are derived from "controlling federal and New York law." *Id.*

**91.** *In re Balfour MacLaine Int'l Ltd.*, 85 F.3d 68, 77 (2d Cir.1996) (citations omitted).

**92.** *Id.* I have already found that the Warehouse Endorsement provides coverage for mysterious disappearances. *See NAFT I*, 413 F.Supp.2d at 304.

**93.** *In re Balfour*, 85 F.3d at 77 (quotation omitted).

**94.** *See* N.Y. C.P.L.R. § 201.

**95.** *See Neary v. Nationwide Mut. Fire Ins. Co.*, 17 A.D.3d 331, 791 N.Y.S.2d 840 (2d Dep't 2005) (citing *Minichello v. Northern Assurance Co. of Am.*, 304 A.D.2d 731, 758 N.Y.S.2d 669, 670–71 (2d Dep't 2003)).

**96.** Policy ¶ 49.

forceable,[97] that does not necessarily end the inquiry. As with any other provisions in the contract, it is for the Court to decide whether the language of the one-year limitations period in the Policy is ambiguous, and if so, how to interpret that provision.

### 3. Waiver and Equitable Estoppel

 "Waiver is a voluntary and intentional relinquishment of a known right with full knowledge of the facts upon which the existence of the right depends."[98] An insurer waives a defense where the insurer asserts other defenses and has knowledge of the circumstances underlying the unasserted defense.[99] Waiver "should not be lightly presumed."[100] Estoppel may arise when "the insurer has taken some action upon which the insured has justifiably relied to his detriment."[101] Where such circumstances exist, estoppel may bar the insurer from asserting an inconsistent position or previously unasserted defense.[102] "[E]stoppel requires a showing of prejudice to the insured."[103]

### a. As to Coverage

 Under New York law, waiver cannot be used to extend an insured's coverage or narrow a policy's exclusions beyond that for which the insured originally bargained.[104] In order for "the forfeiture [ ] to serve any purpose," the "underlying coverage must be subsisting."[105] In other words, an insurer cannot waive a defense to coverage where no coverage exists. Equitable estoppel, by contrast, may be invoked to bar an insurer from contesting coverage in certain circumstances.[106] Es-

97. *See, e.g., Gilbert Frank Corp. v. Federal Ins. Co.,* 70 N.Y.2d 966, 967, 525 N.Y.S.2d 793, 520 N.E.2d 512 (1988).

98. 1 Ostrager & Newman, *Handbook on Insurance Coverage Disputes* § 2.06[a], at 90 (13th ed.2006) (citing *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.,* 302 F.3d 83, 95 (2d Cir.2002)).

99. *See id.* at 91. *See also Nestegg Fed. Credit Union v. Cumis Ins. Soc'y, Inc.,* 87 F.Supp.2d 144, 148 (N.D.N.Y.2000) ("In New York, the act of an insurer disclaiming on certain grounds but not others when the insurer possesses sufficient knowledge (actual or constructive) of the circumstances regarding the unasserted defenses, is deemed *conclusive* evidence of the insurer's intent to waive the unasserted grounds." (citing *State of New York v. AMRO Realty Corp.,* 936 F.2d 1420, 1432 (2d Cir.1991); *Lugo v. AIG Life Ins. Co.,* 852 F.Supp. 187, 192 (S.D.N.Y.1994))).

100. *Gilbert Frank Corp.,* 70 N.Y.2d at 968, 525 N.Y.S.2d 793, 520 N.E.2d 512.

101. 1 Ostrager & Newman, *Handbook on Insurance Coverage Disputes* § 2.06[b], at 93.

102. *See id.* at 94.

103. *Burt Rigid Box,* 302 F.3d at 95. *Accord Bleckner v. General Accident Ins. Co. of Am.,* 713 F.Supp. 642, 651–52 (S.D.N.Y.1989) (" '[T]his rule of estoppel is limited in its application to those instances where the insured has suffered some degree of prejudice.... [It] has its limitations and exceptions, which are as clearly established as the rule itself, one of which is that before the rule can apply it must appear that claimant was misled to his injury.' " (quoting *Guberman v. William Penn Life Ins. Co.,* 146 A.D.2d 8, 538 N.Y.S.2d 571, 573 (2d Dep't 1989) (emphasis omitted))).

104. *See Albert J. Schiff Assocs., Inc. v. Flack,* 51 N.Y.2d 692, 698, 435 N.Y.S.2d 972, 417 N.E.2d 84 (1980) ("[W]here the issue is the existence or nonexistence of coverage (*e.g.,* the insuring clause and exclusions), the doctrine of waiver is simply inapplicable."). *See also* 1 Ostrager & Newman, *Handbook on Insurance Coverage Disputes* § 2.06[a], at 90–92 (collecting cases).

105. *Albert J. Schiff Assocs.,* 51 N.Y.2d at 698, 435 N.Y.S.2d 972, 417 N.E.2d 84.

106. *See id.* at 699, 435 N.Y.S.2d 972, 417 N.E.2d 84 ("In such circumstances [where equitable estoppel is proper], though coverage

toppel in the coverage context "arises where an insurer acts in a manner inconsistent with a lack of coverage, and the insured reasonably relies on those actions to its detriment." [107]

### b. As to Contractual Limitations Period

 Once the insurer has met its burden of establishing that the insured did not bring suit within the limitations period, the insured has the burden to prove, by a preponderance of the evidence, that the case "falls within an exception to the limitations period," such as equitable estoppel or waiver.[108] In order to establish waiver, plaintiff must prove facts "from which the defendant's intent to relinquish the protection of the contractual limitations period

can be reasonably inferred." [109] In order to establish estoppel, plaintiff must prove that it was "misled or lulled by the defendant into failing to bring its claim in a timely manner." [110] "In contrast to when an insured is 'promised repeatedly by agents for the insurer that the loss would be adjusted without litigation,' steps taken by an insurer to investigate a claim do not constitute waiver or estoppel." [111] Moreover, an insurer has no duty to advise an insured of the limitations period.[112]

### 4. Duty of Good Faith

### a. Utmost Good Faith

 " '[P]arties to a marine insurance contract are held to the highest degree of good faith.' " [113] This is known as

---

as such does not exist, the insurer will not be heard to say so."). The line of cases that are cited for the contrary position are limited to situations where the policy was not in effect at the time of the event for which the insured is claiming coverage. *See, e.g., Wausau Ins. Cos. v. Feldman*, 213 A.D.2d 179, 623 N.Y.S.2d 242, 244 (1st Dep't 1995) ("Estoppel may not be used to create coverage where no insurance policy existed. . . ."); *Sedgwick Ave. Assocs. v. Insurance Co. of State of Pa.*, 203 A.D.2d 93, 610 N.Y.S.2d 39, 39 (1st Dep't 1994) ("Where there is no coverage under an insurance policy because the policy was not in existence at the time of the accident, estoppel cannot be used to create coverage.").

107. *Burt Rigid Box*, 302 F.3d at 95.

108. *Id.* (citing *Minichello*, 758 N.Y.S.2d at 670–71).

109. *Enterprise Eng'g, Inc. v. Hartford Fire Ins. Co.*, No. 04 Civ. 5018, 2004 WL 2997857, at *3 (S.D.N.Y. Dec. 23, 2004). *Accord Gilbert Frank Corp.*, 70 N.Y.2d at 968, 525 N.Y.S.2d 793, 520 N.E.2d 512.

110. *Enterprise Eng'g*, 2004 WL 2997857, at *3 (citing *Gilbert Frank Corp.*, 70 N.Y.2d at 968, 525 N.Y.S.2d 793, 520 N.E.2d 512). *Accord Simcuski v. Saeli*, 44 N.Y.2d 442, 449, 406 N.Y.S.2d 259, 377 N.E.2d 713 (1978); *Minichello*, 758 N.Y.S.2d at 670 (to show waiver,

plaintiffs must show that defendants "engaged in a course of conduct which lulled them into inactivity in the belief that their claim would ultimately be processed, or that they were induced by fraud, misrepresentation or deception to refrain from commencing a timely action" (quotation and citations omitted)).

111. *Enterprise Eng'g*, 2004 WL 2997857, at *3 (quoting *Satyam Imports, Inc. v. Underwriters at Lloyd's Via Marsh, S.A.*, No. 03 Civ. 4387, 2003 WL 22349668, at *2 (S.D.N.Y. Oct.14, 2003)). *Accord Minichello*, 758 N.Y.S.2d at 670–71 (" 'Delay by the insurance carrier in completing its investigation of the claim does not excuse the plaintiff from timely commencing an action, since he or she is bound by the terms of the contract to either commence an action prior to the expiration of the limitations period or obtain a waiver or extension of such provision.' " (quoting *Brown v. Royal Ins. Co. of Am.*, 210 A.D.2d 279, 620 N.Y.S.2d 399, 399 (2d Dep't 1994))).

112. *See Compis Servs., Inc. v. Hartford Steam Boiler Inspection & Ins. Co.*, 272 A.D.2d 886, 708 N.Y.S.2d 770, 772 (4th Dep't 2000).

113. *New York Marine & Gen. Ins.*, 266 F.3d at 123 (quoting *Puritan Ins. Co. v. Eagle Steamship Co. S.A.*, 779 F.2d 866, 870 (2d Cir. 1985)).

the duty of utmost good faith, or *uberrimae fidae*.[114] "Under New York law, the doctrine of utmost good faith applies to contracts and risks that are 'marine' in nature, but not to such contracts or risks that involve 'inland marine' matters, such as the inland transportation of goods."[115] The parties dispute whether the duty of utmost good faith applies to the Warehouse Endorsement. I need not decide this issue, however, because as discussed below, Mitsui has breached even the lesser duty of good faith and fair dealing.

### b. Good Faith and Fair Dealing

▃▃▃▃ Even though the duty of utmost good faith is inapplicable here, the parties still owe each other the duty of good faith and fair dealing. "In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance."[116] "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."[117] "While the duties of good faith and fair dealing do not imply obligations inconsistent with other terms of the contractual relationship, they do encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included."[118]

## IV. CONCLUSIONS OF LAW

### A. Coverage

#### 1. Cidmate

Mitsui conceded that it is not contesting that NAFT's goods arrived at the covered Cidmate Warehouse.[119] Thus, I need not address the facts establishing coverage of the Cidmate loss. In any event, even if I were to address the facts, it is more likely than not that NAFT's goods were at the Cidmate Warehouse at the time of the mysterious disappearance.[120]

#### 2. Lionda

In contrast to the Cidmate claim, Mitsui contests coverage of the Lionda claim on the basis of the asserted lack of proof that NAFT's goods actually made it to the covered Lionda Warehouse. Mitsui also contests the amount of the loss, claiming that NAFT should not be able to recover for goods shipped to Lionda prior to January 1, 2004 (when the Old Lionda Facility was in use) on the ground that NAFT cannot prove that the goods were transferred from the old facility to the new covered Lionda Warehouse after January 1, 2004. Although Mitsui has not waived the defense of coverage, Mitsui is estopped both from raising the defense of lack of coverage and contesting the amount of the loss. In any event, NAFT has proved by a

---

114. *See id.*

115. *In re Balfour,* 85 F.3d at 81 (citing *Stecker v. American Home Fire Assurance Co.,* 299 N.Y. 1, 6, 84 N.E.2d 797 (1949); *Scarburgh Co. v. American Mfrs. Mut. Ins. Co.,* 107 Misc.2d 772, 435 N.Y.S.2d 997, 1000–01 (1979), *aff'd,* 79 A.D.2d 942, 439 N.Y.S.2d 298 (1st Dep't 1981)).

116. *511 West 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 773 N.E.2d 496 (2002).

117. *Id.* (quotation omitted).

118. *Id.* (quotations and citations omitted).

119. *See* Tr. at 616:17–23 (Montbach stated "we [Mitsui] accepted the fact that [NAFT's] goods got to the covered warehouse because the warehouse never changed."). To the extent Mitsui may argue that it has not conceded this point, Mitsui would be estopped from asserting lack of coverage as a defense to Cidmate for the same reasons it is estopped from doing so as to Lionda. *See infra* Part IV.A.2.b.

120. *See supra* Part II.B.

preponderance of the evidence that its goods were at the covered Lionda Warehouse at the time of the mysterious disappearance.

### a. Waiver

■ As an initial matter, as discussed above, the waiver doctrine does not apply to the issue of whether coverage exists. Even if it did apply, however, Mitsui did not waive its right to contest coverage because it reserved the right to do so in its declination letter. The reservation of rights clause in the Lionda Declination Letter provides, "Nothing in this communication should be construed as an admission of liability on any claim, or as a waiver, estoppel or modification of any policy terms and/or conditions."[121] This language is sufficient to preclude the use of the waiver doctrine as to Mitsui's defense of lack of coverage.

### b. Estoppel

■ Despite the fact that Mitsui did not waive its right to contest coverage by the failure to assert it in the declination letter, based on the facts and circumstances surrounding Mitsui's conduct, I conclude that Mitsui should be equitably estopped from disputing that NAFT's lost CRUs were at the covered Lionda Warehouse at the time of the mysterious disappearance. Thus, NAFT has a claim for a covered loss.

At all times, Mitsui had access to NAFT's records showing shipments of CRUs to Lionda from late October 2001 to late March 2004.[122] Accordingly, Mitsui had access to and knowledge of what those documents could or could not establish—specifically whether those documents could establish that any of NAFT's CRUs sent to Lionda were at the covered Lionda Warehouse and also whether those documents could establish the amount of goods in the covered warehouse at the time of the loss.

Despite Mitsui's awareness of this possible ground to contest coverage or to dispute the amount of the loss, Mitsui never performed any investigation as to whether the goods arrived at the covered warehouse or whether and what amount of the goods were at the covered warehouse at the time of the loss. Nor did Mitsui ever indicate to NAFT that it would contest NAFT's insurance claim on the ground that NAFT could not prove the location of the goods or decline to pay the bulk of the claim on the ground that NAFT could not prove that the goods were moved from the Old Lionda Facility to the new Lionda Warehouse. NAFT undoubtedly relied on the fact that Mitsui would not contest coverage in light of the fact that NAFT knew Meaden & Moore was charged with investigating the location of the goods[123] and that there was no mention of any discrepancy in the Lionda Declination Letter, or at any other point. Likewise, NAFT relied on the fact that the amount lost would not be contested because NAFT knew Meaden & Moore was charged with investigating the amount of the loss and there was no challenge to the amount of the loss in the Lionda Declination Letter.[124] To the contrary, the declination letter recited that Meaden & Moore confirmed the amount and value of CRUs claimed by NAFT to be missing.

It was not until one week before trial, more than one and a half years after the

---

121. Lionda Declination Letter at 3.

122. See Tr. at 446:2–10, 446:23–447:10 (Sica, Meaden & Moore employee).

123. See UF ¶ 34.

124. That letter declined coverage as to the entire loss, but never distinguished between goods at one warehouse or another.

declination letter was issued, that Mitsui raised these new arguments. NAFT could not be expected to address these eleventh-hour assertions on such short notice before trial, without the benefit of having addressed these issues in discovery, and unmistakably would be prejudiced if required to do so. Because it would be inequitable to require NAFT to respond at the last moment, I conclude that Mitsui is estopped from contesting that NAFT's lost goods were at the covered Lionda Warehouse at the time of the mysterious disappearance.[125]

### c. Proof of Covered Loss

In any event, even if Mitsui were not estopped from contesting coverage as to the Lionda losses, I have found, as discussed above, that it is more likely than not that there were NAFT CRUs at the covered Lionda Warehouse at the time of the mysterious disappearance.[126] Thus, NAFT has proved, by a preponderance of the evidence, that it suffered a covered loss from the covered Lionda Warehouse.

### B. Time–Bar

Mitsui argues that NAFT's claims in both Cidmate and Lionda are barred by paragraph 49 of the Policy, which provides that "[n]o suit or action or proceeding against this Company for the recovery of any claim shall be sustainable unless commenced within one year from the date of the happening of the accident out of which the claim arises...."[127] NAFT argues,

*inter alia: first*, that it would be unreasonable to construe the one-year limitation period to begin before the insured gives notice of its loss; *second*, that Mitsui cannot meet its burden to prove that the losses occurred more than one year before NAFT brought suit in the Cidmate and Lionda actions; and *third*, that in any event, Mitsui waived or should be estopped from asserting the limitations defense.[128]

### 1. "Date of the Happening of the Accident"

#### a. Contract Interpretation

 The first question is whether the one-year time limitation provision in the Policy, specifically the phrase "date of the happening of the accident" is ambiguous. If it is ambiguous, then the Court must determine how that phrase should be interpreted.

The contractual limitation provision here is ambiguous. The phrase "date of the happening of the accident" does not have a definite and precise meaning when "viewed objectively ... [in] the context of the entire integrated agreement."[129] Unlike a flood or a fire, the precise date of the happening of a mysterious disappearance is not easily ascertainable, if at all. Given that the Policy provides coverage for all risks, including mysterious disappearance, the phrase "date of the happening of the accident" is reasonably susceptible to more than one meaning depending on the under-

---

**125.** Even if Mitsui were not estopped from disputing the amount of the loss, that would not change the result in this case. NAFT without question has met its burden to establish a prima facie case of a covered loss. *See International Multifoods,* 309 F.3d at 83. Mitsui thus had the burden of "putting forward evidence establishing that an exception to coverage applies." *In re Balfour,* 85 F.3d at 77 (quotation omitted). Mitsui has not met its burden to show that the amount of NAFT's CRUs that were lost from the covered Lionda

Warehouse was less than the amount claimed by NAFT.

**126.** *See supra* Part II.C.

**127.** Policy ¶ 49.

**128.** *See* Plaintiff's Post–Trial Brief at 13–19.

**129.** *Alexander & Alexander,* 136 F.3d at 86 (quotation omitted).

lying risk to which it is being applied. Although perhaps reasonable with respect to claims arising out of a fire, it would defy common sense to apply a strict one-year limitation period to a claim arising out of a mysterious disappearance—of which the precise date indisputably cannot be determined—as beginning to run *before* the insured is even aware of the fact that its goods are missing.

Construing this ambiguity against Mitsui and in favor of NAFT,[130] I conclude that the only reasonable interpretation of the phrase "date of the happening of the accident," when applied to a claim for mysterious disappearance on an unknown date, is that the one-year period begins to run on the date when the insured knew or should have known that its goods have disappeared.[131]

### b. Application to Cidmate

As discussed above, the first time NAFT knew or should have known of the disappearance of its goods from the Cidmate Warehouse was when Schweitzer gained access to the Cidmate Warehouse on April 21, 2004.[132] By virtue of the standstill agreements entered into by NAFT and Mitsui, NAFT is treated as having brought suit on April 18, 2005. Accordingly, NAFT brought suit within one-year from the date by which it knew or should have

known of the disappearance of its goods, and thus, NAFT's claim for the Cidmate loss is timely.

### c. Application to Lionda

I have already held that "if the trier of fact determines that NAFT's loss occurred after May 25, 2004, Mitsui is estopped as a matter of law from asserting a limitations defense at trial" based on the Court's determination that Mitsui had lulled NAFT into delaying filing suit.[133] In other words, NAFT will be treated as having filed suit on May 25, 2005 for time-bar purposes. As discussed above, however, NAFT knew or should have known that its goods were missing from the Lionda Warehouse no later than May 17, 2004.[134] Accordingly, NAFT did not bring suit within one-year from the date by which NAFT knew or should have known of the disappearance of its goods. Thus, NAFT's claim relating to the Lionda losses are untimely, and must be dismissed, unless NAFT has proven, by a preponderance of the evidence, that the case "falls within an exception to the limitations period." [135]

### 2. Waiver, Estoppel and Good Faith as to the Lionda Claims

#### a. Waiver

Because I conclude that estoppel and Mitsui's breach of the duty of good faith

**130.** *See Pepper,* 799 N.Y.S.2d at 294 ("[W]hen an insurance policy's meaning is not clear or is subject to different reasonable interpretations, ambiguities must be resolved in the insured's favor and against the insurer."). *Accord Parks Real Estate,* 472 F.3d at 43 ("[W]here an insurer drafts a policy 'any ambiguity in [the] ... policy should be resolved in favor of the insured.' " (alteration in original) (quoting *Morgan Stanley Group,* 225 F.3d at 276)); *This Is Me, Inc. v. Taylor,* No. 89 Civ. 1339, 1996 WL 20745, at *1 (S.D.N.Y. Jan.17, 1996) (contractual limitation clauses that narrow the statutory limitation "are not looked upon with favor" and that they "should be construed with strictness against

the party invoking them." (quotation omitted)).

**131.** The Court's interpretation differs from the proposed interpretation advanced by NAFT, which argues that the period should begin to run when the insured gives notice to the insurer.

**132.** *See supra* Part II.B.1.

**133.** *NAFT II,* 477 F.Supp.2d at 385–86.

**134.** *See supra* Part II.C.1.

**135.** *Minichello,* 758 N.Y.S.2d at 669.

provide sufficient grounds on which to preclude Mitsui from relying on the limitations defense, I need not address whether Mitsui waived the limitations defense by failing to raise it in the declination letter. Accordingly, I move directly to estoppel and good faith.

### b. Estoppel and Good Faith

 Mitsui's conduct regarding its handling of NAFT's Lionda claim amounts to a breach of its duty of good faith and fair dealing and merits application of equitable estoppel to preclude its reliance on the limitations defense. I have little doubt based on the facts developed at trial that Mitsui always intended to deny NAFT's claim for losses arising from the mysterious disappearance from the Lionda Warehouse on the same grounds on which it planned to, and did, deny the Cidmate claim. Indeed, Mitsui ultimately did precisely that—albeit almost a full year after it received notification of the Lionda loss. Despite its clear intention, Mitsui nonetheless repeatedly told NAFT that it was investigating the Lionda claim and represented that it was waiting for the Meaden & Moore report before it could make a determination. But even so, Mitsui waited almost another two months after receiving the Meaden & Moore report, which Mitsui never told NAFT it had received and which supported NAFT's claim of loss, before issuing the declination letter disclaiming coverage solely on the ground that the Warehouse Endorsement did not cover the loss sustained at the Lionda Warehouse.

I conclude that Mitsui acted in bad faith and lulled NAFT into forbearing from bringing suit until after what Mitsui thought to be the expiration of the one-year limitations period. Mitsui should have acted in good faith by issuing a reservation of rights letter to inform NAFT of Mitsui's position on the Warehouse Endorsement as to the Lionda loss at the same time it declined coverage on that basis for the Cidmate loss. Instead, Mitsui lulled NAFT into thinking that Mitsui seriously considered whether the Lionda claim would be treated differently than the Cidmate claim. To permit an insurer to benefit from such dubious conduct at the expense of the insured would send a signal to insurers that they can avoid paying meritorious claims through purposeful evasion and delay.

## V. CONCLUSION

NAFT has proved by a preponderance of the evidence that it is entitled to recover for the losses that resulted from a mysterious disappearance from the Cidmate Warehouse. NAFT has proved by a preponderance of the evidence that it is entitled to partial recovery for claimed losses that resulted from a mysterious disappearance from the Lionda Warehouse. Mitsui is thus liable to NAFT in the amount of $1,125,000 as to the Cidmate claim (which is $1.25 million minus the ten percent deductible), and $6,300,000 as to the Lionda claim (which is $7 million minus the ten percent deductible), for a total of $7,425,000 plus interest. The Clerk of the Court is directed to prepare a judgment in accordance with this Opinion and to close this case.

SO ORDERED.